IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Criminal Action No. 07-25-JJF |
| | ) ) ) | |
| ROBERT COTTMAN, III, | ) ) | |
| Defendant. | ) ) | |

**POST-HEARING BRIEF**
**OF THE UNITED STATES TO DEFENDANT'S**
**AMENDED MOTION TO SUPPRESS**

COLM F. CONNOLLY
UNITED STATES ATTORNEY
Robert J. Prettyman
Assistant U.S. Attorney
1007 N. Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899-2046

Date:  July 17, 2007

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF CITATIONS ..... ii

STATEMENT OF FACTS ..... 1

ARGUMENT ..... 6

   1. The stop of the car in which the defendant
     was traveling was valid because the driver
     of that car committed a motor vehicle violation
     by driving on a suspended license. ..... 6

   2. The seizure of the identification card that the
     defendant was attempting to hide was legally
     justified because the card was evidence of a
     crime. ..... 9

   3. The fruits of the search of the defendant's
     residence should not be suppressed because:
     (a) the search condition of the defendant's
     probation lessened the defendant's reasonable
     expectation of privacy such that the totality of
     the circumstances known to Probation Officer
     Dupont satisfied the Fourth Amendment's
     requirement of reasonableness; and (b) Probation
     Officer Dupont had reasonable suspicion
     to search the defendant's residence. ..... 11

      a. The search condition of the defendant's
       probation decreased his reasonable
       expectation of privacy to an extent that
       the totality of the circumstances made
       the search reasonable under the Fourth
       Amendment. ..... 12

      b. The probation officer had reasonable
       suspicion to search the defendant's home. ..... 26

   4. The defendant's statements were volunteered
     and should not be suppressed. ..... 28

CONCLUSION ..... 36

## <u>TABLE OF CITATIONS</u>

| <u>Cases</u> | <u>Page(s)</u> |
|---|---|
| *Brown v. Illinois,* <br> 422 U.S. 590 (1975) | 7 |
| *California v. Acevedo,* <br> 500 U.S. 565 (1991) | 11 |
| *Colorado v. Connelly,* <br> 479 U.S. 157 (1986) | 34 |
| *Fuller v. State of Delaware,* <br> 844 A.2d 290 (Del. Supr. 2004) | 15 |
| *Griffin v. Wisconsin,* <br> 483 U.S. 868 (1987) | 14-15 |
| *Harris v. New York,* <br> 401 U.S. 222 (1971) | 33 |
| *Lego v. Twomey,* <br> 404 U.S. 477 (1972) | 33 |
| *Maryland v. Pringle,* <br> 540 U.S. 366 (2003) | 20, 24 |
| *Medeiros v. Shimoda,* <br> 889 F.2d 819 (9th Cir. 1989) | 33, 36 |
| *Miranda v. Arizona,* <br> 384 U.S. 436 (1966) | *passim* |
| *Missouri v. Seibert,* <br> 542 U.S. 600 (2004) | 33 |
| *Oregon v. Elstad,* <br> 470 U.S. 298 (1985) | 33 |
| *Rawlings v. Kentucky,* <br> 448 U.S. 98 (1980) | 26 |
| *Rhode Island v. Innis,* <br> 446 U.S. 291 (1980) | 29-31 |

**TABLE OF CITATIONS** (cont.)

| **Cases** | **Page(s)** |
|---|---|
| *Samson v. California,*<br>126 S.Ct. 2193 (2006) | *passim* |
| *State of Ohio v. Hill,*<br>713 N.E.2d 73 (Ohio App. 2 Dist. 1998) | 26 |
| *Texas v. Brown,*<br>460 U.S. 730 (1983) (plurality opinion) | 10 |
| *United States v. Abdulla,*<br>294 F.3d 830 (7th Cir. 2002) | 32, 36 |
| *United States v. Amerson,*<br>483 F.3d 73 (2d Cir. 2007),<br>*pet. for cert. filed* July 3, 2007 (No. 07-5140) | 18 |
| *United States v. Arvisu,*<br>534 U.S. 266 (2002) | 19, 26 |
| *United States v. Bonner,*<br>363 F.3d 213 (3d Cir. 2004) | 19 |
| *United States v. Bowers,*<br>No. 04-133-KAJ,<br>2006 WL 1537378 (D.Del. June 5, 2006), | 15 |
| *United States v. Brown,*<br>448 F.3d 239 (3d Cir. 2006) | 19, 21-22, 27 |
| *United States v. Brunswick,*<br>Cr. A. No. 01-66-JJF,<br>2002 WL 31466451<br>(D.Del. November 4, 2002)<br>(unreported opinion) | 35 |
| *United States v. Calisto,*<br>838 F.3d 711 (3d Cir. 1988) | 29, 31-32 |
| *United States v. Chandler,*<br>326 F.3d 210 (3d Cir. 2003) | 20, 24 |

## TABLE OF CITATIONS (cont.)

| Cases | Page(s) |
|---|---|
| *United States v. Chirino,*<br>483 F.3d 141 (2d Cir. 2007) | 16 |
| *United States v. Coggins,*<br>986 F.2d 651 (3d Cir. 1993) | 19, 22 |
| *United States v. Conley,*<br>4 F.3d 1200 (3d Cir. 1993) | 20, 23 |
| *United States v. Delfin-Colina,*<br>464 F.3d 392 (3d Cir. 2006) | 6 |
| *United States v. DeSumma,*<br>272 F.3d 176 (3d Cir. 2001) | 24, 33, 36 |
| *United States v. Freeman,*<br>479 F.3d 743 (10th Cir. 2007) | 16 |
| *United States v. Green,*<br>111 F.3d 515 (7th Cir. 1997) | 8 |
| *United States v. Hodge,*<br>246 F.3d 301 (3d Cir. 2001) | 21, 25 |
| *United States v. Howard,*<br>210 F.Supp.2d 503 (D.Del. 2002) | 21 |
| *United States v. Jacobs,*<br>431 F.3d 99 (3d Cir. 2005) | 34 |
| *United States v. Johnson,*<br>816 F.2d 918 (3d Cir. 1987) | 33 |
| *United States v. Keith,*<br>375 F.3d 346 (5th Cir. 2004) | 23 |
| *United States v. Kiam,*<br>432 F.3d 524 (3d Cir. 2006) | 33 |
| *United States v. Knights,*<br>534 U.S. 112 (2001) | *passim* |

## TABLE OF CITATIONS (cont.)

| Cases | Page(s) |
|---|---|
| *United States v. McCray,*<br>148 F.Supp. 2d 379 (D.Del. 2001) | 20 |
| *United States v. Moorefield,*<br>111 F.3d 10 (3d Cir. 1997) | 6 |
| *United States v. Morales,*<br>788 F.2d 883 (2d Cir. 1986) | 24 |
| *United States v. Mosley,*<br>454 F.3d 249 (3d Cir. 2006) | 7 |
| *United States v. Murphy,*<br>261 F.3d 741 (8th Cir. 2001) | 11 |
| *United States v. Nelson,*<br>284 F.3d 472 (3d Cir. 2002) | 19, 25, 27 |
| *United States v. Pettigrew,*<br>468 F.3d 626 (10th Cir. 2006) | 32, 33-34, 36 |
| *United States v. Rice,*<br>483 F.3d 1079 (10th Cir. 2007) | 10 |
| *United States v. Ross,*<br>456 U.S. 798 (1982) | 11 |
| *United States v. Sanchez,*<br>No. 03-030449, 2004 WL 1738006<br>(9th Cir. Aug. 2, 2004)<br>(unpublished opinion) | 22 |
| *United States v. Simpson,*<br>439 F.3d 490 (8th Cir. 2006) | 8 |
| *United States v. Sokolow,*<br>490 U.S. 1 (1989) | 20, 28-29 |
| *United States v. Swint,*<br>15 F.3d 286 (3d Cir. 1994) | 33-34 |

## <u>TABLE OF CITATIONS</u> (cont.)

| <u>Cases</u> | <u>Page(s)</u> |
|---|---|
| *United States v. Trujillo,*<br>404 F.3d 1238 (10th Cir. 2005) | 23 |
| *United States v. Williams,*<br>417 F.3d 373 (3d Cir. 2005) | 14-15, 26 |
| *Worley v. State of Delaware,*<br>No. 107, 1993,1993 WL 370843,<br>(Del. Supr., August 30, 1993)<br>(unpublished opinion) | 10 |
| *Wyoming v. Houghton,*<br>526 U.S. 295 (1999) | 20, 22 |

### <u>Statutes</u>

| | |
|---|---|
| 11 Del. C. §907(1) | 10 |
| 21 Del. C. §2756 | 6 |

## STATEMENT OF FACTS

Late in the evening on February 17, 2007, the defendant, Robert Cottman, III, was a passenger in a car driven on public roadways in the vicinity of Third or Fourth and Clayton Streets, Wilmington, Delaware.  Docket Item 18, Tr.A.,pp. 32-33, 35-36, 38, 53, 88-91.[1]  Wilmington Police Officer Robert Fox, who was working with State Probation Officer William Dupont in that area that night, recognized the driver of that car, Josue Torres, and believed that Torres had a suspended license based upon a computer check on or near January 6, 2007. Tr.A., pp. 31, 33, 46-47, 50-53.  Officer Dupont, an expert on drug investigations and knowledgeable that the area in which the defendant was riding as a passenger was a high drug trafficking area, had received information from at least three community sources that, within the last month, that car had been operated by a person distributing drugs in that area. Tr.A., pp. 91-92, 100-101, 110, 139, 157-158, 161; Government's Suppression Hearing Exhibit 6. At 11:58 p.m. on February 17, 2007, Officer Fox conducted a computer check of the status of the license of the driver and confirmed that his license was suspended. Tr.A., pp. 13-15, 34-35, 46-48, 54-55, 87-90; Government's  Suppression Hearing Exhibits 2, 3,  and 10. The officers stopped the car in which the defendant was riding as a passenger in the vicinity of 400 block of Scott Street, Wilmington. Tr.A., pp. 38.

When the defendant was asked to provide identification, he essentially stated that he did not have any in his possession and began to pat himself down. Tr.A., pp. 92-93.   The defendant provided a false name and date of birth to Officer Dupont, who via

---

[1]References to Docket Item 18, the transcript of the hearing on June 7, 2007 are denoted as "Tr.A., p.*."  References to the transcript of the hearing on July 9, 2007 are denoted as "Tr.B., p.*."

radio called that information into the Wilmington Police Dispatcher. Tr.A., pp. 93-94, 96-98; Government Suppression Hearing Exhibits 4, 5 and 10. The computer inquiry of the warrant check in that false name occurred at 11:59 a.m. on February 17, 2007. Tr.A., pp. 16-17, 22, 94-97; Government Suppression Hearing Exhibits 3, 4, and 10. [2] Next, Officer Dupont observed the defendant remove what appeared to be an identification card from his wallet and attempt to conceal his identification card under his leg. Tr.A., p. 98. Officer Dupont requested that the defendant hand him the identification card, but the defendant essentially replied, what identification card? Tr.A., p. 98. Consequently, Officer Dupont reached into the car and seized the identification card. Tr.A., p. 98-99. That card revealed the defendant's true name and address of record in Wilmington, Delaware. Tr.A., p. 99. A check under the defendant's true name at 12:00 a.m. on February 18, 2007, revealed that he was wanted on capiases from Delaware courts - one capias from Superior Court for a violation of probation hearing and two capiases from Family Court. Tr.A., p. 17, 22, 94-96, 99. *See also* Government's Suppression Hearing Exhibits 3, 4, 5, and 10.    Officer Dupont arrested the defendant and searched him, finding a large wad of money. Tr.A., pp. 99-100, 112, 148.    Subsequently, Officer Dupont did not count, but looked through the wad of money and saw some of the

---

[2] Since different clocks were used for the radio transmissions, the notes of Officer Dupont and the computer queries, it is important to find a common denominator. The clock for the computer queries provides that common denominator because that clock is the only clock that captures the verification of the status of the driver's license for the driver of the car in which the defendant was riding when stopped, the warrant check for the false name provided by the defendant to Officer Dupont, and the warrant check in the defendant's true name. Tr.A., pp.13-17, 22, 34-35, 46-48, 54-55, 87-90, 94-97, 99; Government Suppression Hearing Exhibits 2-5 and 10.

denominations. Tr.A., p.100, 147-148.[3] He inquired as to the amount of the money, as well as whether the defendant was employed and had pay stubs. *Id*. The defendant answered that the amount was "a little over $500" and that he earned the money from working as a painter "under the table," and did not have any pay stubs. Tr.A., pp. 100, 147.

Next, beginning at 12:04 a.m., on February 18th, Officer Dupont performed a computer check and learned that the defendant:

1) was on state probation;

2) was wanted on Family Court capiases for support arrears and from Superior Court for violation of probation; and

3) had a prior arrest record for seven sets of drug-related charges in approximately the last ten years.

Tr.A., pp. 17-18, 101-103; Government Suppression Hearing Exhibit 7.

At approximately 12:06 a.m., he also verified with the state probation monitoring center in Dover that the defendant was on probation and that his listed address was the same address in Wilmington, Delaware that appeared on the defendant's identification card. Tr.A., p. 103-104. Before the search of his home, the defendant stated in response to questions by Officer Dupont that: 1) lived there with his mother, 2) he resided in an upstairs bedroom, and 3) his mother should be home. Tr.A., pp. 117-118, 150.

The totality of the circumstances concerning the defendant and known to Probation Officer Dupont, including the defendant's status a probationer, his prior arrest record for drug-related charges, prior information from at least three community sources

---

[3] The testimony of Officer Fox and Officer Dupont differed on the denominations of the money. Tr. A., pp. 74-75, 140-141, 147-149.

within the last month that the car in which the defendant was a passenger had been operated in that area by a person involved in the distribution of drugs in that area, the high drug-trafficking location in which the defendant had been present in the car that night, his possession of approximately $500.00 in cash, while a fugitive for two Family Court capiases for hearings for failing to pay support arrears, and the defendant's evasive conduct concerning his true identity supported an administrative probation search of the defendant's nearby residence. Tr.A., pp. 7, 17-18, 32- 33, 87-103, 108-114, 139-140, 147-148, 157-158, 161; Government Suppression Hearing Exhibits 6 and 7.[4]   At approximately 12:20 a.m., probation officers searched the defendant's residence and seized firearms and ammunition, as well as some other evidence such as Family Court paperwork and a card and envelope, during that search. Tr.A., pp. 71, 117-126,172-176.

The defendant also made inculpatory volunteered statements concerning the ammunition and the firearms. Tr.A., pp. 38-42, 59, 78-79, 124-129, 184-187. After the probation officers found ammunition in the defendant's second floor bedroom, and Officer Dupont so advised the defendant's mother, the defendant blurted out that he had found the ammunition outside and brought it inside to keep it away from his house. Tr.A., pp. 38-40, 78, 120-123, 128-129. After Officer Dupont discovered the .22 caliber revolver under the mattress in the other upstairs bedroom, and so advised the defendant's mother, the defendant volunteered another blurt-out—that he had put that gun under his

---

[4]State Probation Officer Patrick Cronin, Officer Dupont's supervisor, approved the search. Tr.A., pp.114-115; Government Suppression Hearing Exhibit 8.

On cross-examination, Officer Dupont stated that the information concerning the car was not part of the totality of the circumstances he used to justify the search (Tr. A., p. 139), but on direct and re-direct examinations, he testified that the driver of the car, the money and the location played a part in the totality of the circumstances for his justification to search the defendant's residence (Tr. A., pp. 110, 162).

mother's mattress for her safety. Tr.A.,pp. 38-39, 122-125, 128-129. The defendant made a third blurt-out after Probation Officer Cerminaro searched a common first floor area and found a bag with a semi-automatic revolver. Tr.A., pp. 38, 40-41, 78-79, 125-126. The defendant looked in the direction of his mother and said that they got the bag and that he got that outside in the alleyway. Tr.A., pp. 40, 125-126, 128-129.

During transportation to the police station by Officers Fox and Dupont after the search of his residence, when Officer Dupont was talking to Officer Fox about this case being the first case in a new gun initiative, the defendant blurted out again. Tr. A., pp. 126-127. He volunteered that he found the guns on the side of the house and brought them inside for safety and he put the revolver under his mother's mattress for her safety. Tr.A., pp. 41-42, 126-129.

Approximately two days later, during transportation to the U.S. Marshal's Office, the defendant made his final blurt-out. He volunteered in the presence of Special Agent Diane Iardella, Bureau of Alcohol, Tobacco, Firearms & Explosives, that this was all over this little gun he put under his mother's bed and he took a felony ten years ago. Tr.A., pp. 185-187.

**ARGUMENT**

1. ***The stop of the car in which the defendant was traveling was valid
because the driver of that car committed a motor vehicle violation
by driving on a suspended license.***

The defendant has filed a suppression motion, arguing that there was not
reasonable suspicion to support the stop of the vehicle in which the defendant was a
passenger and, consequently, the stop violated the Fourth Amendment. Docket item 14,
paragraphs 8-10. Before the car was stopped, Police Officer Robert Fox confirmed
through a computer check that the driver of that car had a suspended license. Tr.A., pp. 7,
13-17, 32-36, 46-47, 52-53, 80, 83-85, 87-91, 93-97; Government Suppression Hearing
Exhibits 2, 3 and 10. Driving with a suspended license is a traffic violation. *See* 21 *Del.
C.* §2756; Tr.A., p. 35-36. Commission of the traffic violation is sufficient to justify the
stop under the Fourth Amendment. *United States v. Delfin-Colina*, 464 F.3d 392, 397-
398 (3d Cir. 2006); *United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997)(citations
omitted).

Additionally, the stipulation that Josue Torres would have testified that his license
was not suspended does not undermine the testimony that Torres' license was suspended
because Torres' stipulated testimony is not credible. For example, Mr. Torres' statement
that his license was not suspended (Tr.B., pp. 15, 16, 19) is contradicted by the testimony
of Margaret Bell, Officer Fox, Officer Dupont and the computer information. Tr.A., pp.
13-15, 34-35, 46-48, 54-55, 87-90; Government's Suppression Hearing Exhibits 2 and
10. Additionally, Torres' stipulated testimony that he did not consent to a search of the
car (Tr.B.,pp. 15, 16, 19) that contradicts Officer Fox's testimony that Torres did consent
(Tr.A., p. 60), is not significantly material to the issues raised by the defendant in his

suppression motion and Mr. Torres' statement that he refused to consent to a search of the vehicle because it was his father's car (Tr.B., pp. 15-16, 19) is contradicted by the computer query that showed that the car was registered to Gloria Torres (Tr. A., pp. 10-12, 34-35 and Government's Suppression Hearing Exhibit 1). Finally, all of Mr. Torres' stipulated testimony is impeached because of his bias- bias against the Wilmington Police because of his prior arrests by the Wilmington Police, including an arrest for which he is incarcerated in lieu of bail (Tr.A., pp. 60-61; Tr.B.,pp. 4-5, 16-17, 19), and bias in favor of the defendant with whom he was raised in the same neighborhood and is friendly (Tr.B., pp. 16-17, 19).

Moreover, even if the Court finds that the stop of the car was illegal because the officers learned of the suspension of Torres' license from the computer query very shortly after the stop of the car, as opposed to before the stop, the Court need not suppress the fruits of the stop because any taint of any illegal stop was purged by attenuation- the existence of outstanding arrest warrants for the defendant. *United States v. Mosley*, 454 F.3d 249, 251, 269 (3d Cir. 2006). Three factors are considered in determining whether there is sufficient attenuation to purge a prior illegality: 1) the time between the illegal detention and the obtaining of the evidence; 2) the intervening circumstance that purges the taint; and 3) the reason and flagrancy of the misconduct by the officer. *Brown v. Illinois*, 422 U.S. 590, 603-604 (1975).

In this case, while only 5 minutes elapsed from the alleged illegal detention, the intervening event was the discovery of outstanding arrest warrants for the defendant. Tr.A., pp. 7, 13-17, 36, 83-84, 87-89, 93-94; Government Suppression Hearing Exhibits 3, 4 and 10. When the discovery of an arrest warrant is the intervening factor, the

temporal proximity factor is less important in the analysis. *United States v. Simpson*, 439 F.3d 490, 495 (8th Cir. 2006), *citing United States v. Green,* 111 F.3d 515, 522 (7th Cir. 1997). "Where the discovery of an arrest warrant constitutes the intervening circumstance, 'it is an even more compelling case for the conclusion that the taint of the original illegality is dissipated.'" *Id.* An open arrest warrant is an "extraordinary intervening circumstance that purges much of the taint" of the prior illegality. *Simpson*, 439 F.3d at 496.

Moreover, the United States submits that, even if the Court finds that the stop of the car very shortly preceded the computer inquiry concerning Torres' license, any error by the officer was not flagrant because the officers at least would have confirmed that Torres' license was suspended during the traffic stop. The evidence showed that, on or about January 6, 2007, Officer Fox had knowledge from a computer inquiry that Torres, the driver of the car in which the defendant was riding, had a suspended license and that, on the night in question-February 17, 2007, Officer Fox confirmed that Torres' license was suspended before both the traffic stop and the warrant checks on both the false name that the defendant provided to Probation Officer Dupont and the defendant's true name. Tr.A., pp. 7, 13-17, 32-36, 46-48, 52-55, 80, 83-85, 88-91, 93-99; Government Suppression Hearing Exhibits 3, 4 and 10.

Consequently, for the above-stated reasons, the United States submits that the capiases for the defendant's arrest were intervening circumstances that purged any taint from any illegal stopping of the car in which the defendant was riding, and the fruits of that stop should not be suppressed.

In conclusion, the United States respectfully requests that the Court deny this aspect of the defendant's suppression motion either because the driver's commission of a traffic violation justified the stopping of the car or the presence of the arrest warrant sufficiently purged any illegality of that stop.

### 2. *The seizure of the identification card that the defendant was attempting to hide was legally justified because the card was evidence of a crime.*

In his suppression motion, the defendant also argues that Officer Fox's partner that night, State Probation Officer Dupont improperly seized his identification card in violation of the Fourth Amendment. Docket item 14, paragraphs 11-12.

The evidence demonstrated that Officer Dupont approached the passenger side of the car and sought to obtain identification from the defendant. Tr.A., pp. 92-94. The defendant stated that he did not have identification in his possession and started to pat down himself and his pants as if attempting to show that he could not locate identification. Tr.A., pp. 92-94. The defendant then verbally provided Officer Dupont a false name and birth date. Tr.A., pp. 93-94. While Officer Dupont was calling on the radio to obtain a computer check on the false information that the defendant had provided, Officer Dupont saw the defendant take his wallet from his right rear pants pocket and remove what appeared to be an identification card. Tr.A., p. 98. Then, Officer Dupont observed the defendant attempt to conceal the identification card under his right leg, at which point Officer Dupont asked the defendant to hand him the identification card. Tr.A., p. 98. The defendant essentially replied what identification card? Tr.A., p. 98. As a result, Officer Dupont reached into the open window, took custody of the identification card and saw that the name and date of birth on the identification card were

different from the information that the defendant had provided verbally. Tr.A., pp. 98-99. Officer Dupont called over the radio for a computer inquiry of the defendant's true identity and learned that the defendant was wanted on capiases from Family Court for failure to appear and a capias from Superior Court for violation of probation. Tr.A., p. 99.

Officer Dupont's actions were proper. As an initial matter, it is appropriate for an officer to request identification from a passenger during a traffic stop. "[B]ecause passengers present a risk to officer safety equal to the risk presented by the driver..., an officer may ask for identification from passengers and run background checks on them as well." *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007)(citing cases).

Further, the defendant's statement that he did not have identification, his patdown of his himself and his pants in an obvious attempt to persuade the officer that he did not have identification and his attempt to conceal the identification card in the officer's presence provided legal justification for Officer Dupont to seize the identification card as evidence of the defendant's possible commission of the crime of criminal impersonation. Tr. A., pp. 92-94, 98-99, 112. *Worley v. State of Delaware*, No. 107, 1993, 1993 WL 370843 at *1-2, 633 A.2d 372(table)(Del. Supr., August 30, 1993)(unpublished opinion)(to prove criminal impersonation under 11 *Del. C.* §907(1), the state must prove that the defendant knowingly and unlawfully pretended to be another person to avoid prosecution and proof that the defendant identified himself as someone else because of outstanding capiases satisfied §907(1)). *See Texas v. Brown*, 460 U.S. 730, 739, 741, n.6, 741-742, 744 (1983)(plurality opinion)(citations omitted)(in a plain view situation, "if, while lawfully engaged in an activity in a particular place, police officers perceive a

10

suspicious object, they may seize it immediately," when there is probable cause to seize the item even if the seizure involves a "warrantless, physical intrusion" into a car that had been stopped at a driver's license checkpoint); *California v. Acevedo*, 500 U.S. 581, 579-580 (1991)(the police may conduct a warrantless search of a car and the containers within it when the police have probable cause to believe evidence is contained therein);*United States v. Ross*, 456 U.S. 797, 800, 809, 825 (1982)(police may conduct a warrantless search of a legally stopped car based upon probable cause). *Cf. United States v. Murphy*, 261 F.3d 741, 743-744 (8th Cir. 2001)(officer could lawfully seize driver's license of a defendant who had advised the officer that he did not have identification, but who had a license visibly protruding from a wallet that the defendant voluntarily showed to the officer after a pat-down).

For the above-mentioned reasons, the United States respectfully requests that the Court deny this part of the defendant's motion to suppress.

**3.**   ***The fruits of the search of the defendant's residence should not be suppressed because: (a) the search condition of the defendant's probation lessened the defendant's reasonable expectation of privacy such that the totality of the circumstances known to Probation Officer Dupont satisfied the Fourth Amendment's requirement of reasonableness; and (b) Probation Officer Dupont had reasonable suspicion to search the defendant's residence.***

After learning the defendant's true identity during the car stop, probation officers conducted a search of his residence and seized 3 boxes of ammunition, a loaded .22 caliber Rossi revolver, and a Smith and Wesson semi-automatic pistol, as well as other evidence such as Family Court paperwork, and a card and envelope. Tr.A., pp. 120-126, 172-174. The defendant has moved to suppress the fruits of the probation search of his

home, arguing that the search was not supported by reasonable suspicion. Docket Item 14, paragraphs 13-18. The United States respectfully requests that the Court deny the defendant's motion to suppress the evidence seized from the defendant's residence pursuant to the probation search because (a) the conditions of the defendant's probation that required him to permit the supervising probation officer to enter his residence and subjected him to a search of his living quarters and person without a warrant at any time by a probation officer decreased the defendant's reasonable expectation of privacy such that the totality of the circumstances known to the probation officer before the search of the defendant's residence satisfied the Fourth Amendment's requirement of reasonableness; and/or (b) reasonable suspicion justified the search.

> ### a. The search condition of the defendant's probation decreased his reasonable expectation of privacy to an extent that the totality of the circumstances made the search reasonable under the Fourth Amendment.

Since 2000, the United States Supreme Court has issued important rulings concerning searches of persons on post-conviction supervision in *Samson v. California*, 126 S.Ct. 2193 (2006) and *United States v. Knights*, 534 U.S. 112 (2001).

In *Knights*, the defendant was on probation from a California Court. 534 U.S. at 114. Included in the probation order was a condition that the defendant submit at anytime to a search by any probation or law enforcement officers of himself, his property and his home, regardless of the existence of a warrant or of reasonable cause. *Id.* The defendant acknowledged in writing on the probation order that he had been provided a copy of the order and that he had read, understood and agreed to comply with the terms and conditions of his probation. *Id.* A sheriff's detective was investigating an arson for which

the defendant was under suspicion. *Id.* at 114-115.  The detective knew of the search condition in the defendant's probation order and searched the defendant's residence without a warrant. *Id.* at 115. The search yielded evidence that incriminated the defendant in the arson.  *Id.* The defendant challenged the search of his residence and the matter eventually reached the Supreme Court. *Id.* at 116. After balancing the extent of the intrusion of the search on the defendant's privacy against the need for the search to advance the interests of rehabilitation of the probationer and safeguarding the public from crimes by the probationer, the Supreme Court decided that the Fourth Amendment permits a search conducted pursuant to such a probation condition and based upon no more than reasonable suspicion. *Id.* at 118-122. The Supreme Court related that the Court was not required to decide whether the Fourth Amendment would permit a suspicionless search by a law enforcement officer because reasonable suspicion existed for the search in the case under review. *Id.* at 120, n.6.

In June 2006, the United States Supreme Court addressed the question of what, if any level of suspicion is necessary to justify a search of a person under supervision. *See Samson v. California*, 126 S.Ct. 2193, 2196 (2006). In *Samson*, the defendant was on parole, subject to a statutory condition that parolees shall agree to be subject to search or seizure by parole and peace officers at all times, regardless of the existence of a warrant or the existence of cause for the search and seizure. *Id.* at 2196. The Supreme Court held that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id.* at 2202. In support of its ruling, the Court relied upon: 1) the condition of release providing for suspicionless searches by officers, 2) the resultant lessening or removing of a released prisoner's reasonable expectation of privacy

proceeding from that condition of release, 3) the fact that parolees have fewer expectations of privacy than probationers and "parole is more akin to imprisonment than probation," and 4) the governmental interest in supervising parolees to prevent recidivism, protect the public and successfully integrate the parolee into society. *Id.* at 2197-2202.

The ruling in *Samson* permitting reasonable searches of persons under supervision applies here. *Samson*, 126 S.Ct. at 2201, n. 4. The governmental interests promoted by searches of probationers -- rehabilitation of the supervisee and protection of the community from recidivism by the supervisee [(*see United States v. Knights*, 534 U.S. 112, 119-121 (2001)] essentially are the same interests promoted by searches of parolees (*see Samson*, 126 S.Ct. at 2200). In both the parole and probation context, there is a lessening of the person's reasonable expectation of privacy from the search condition to which the person agreed. *Samson*, 126 S.Ct. at 2196, 2199; *Knights*, 534 U.S. at 119-120; *United States v. Williams*, 417 F.3d 373, 376 and 376, n. 2(3d Cir. 2005)(citations omitted).[5] The defendant in the case at bar was advised of, and agreed to the following as

---

[5]In *Williams*, the Third Circuit reasoned that there are two paths under the Fourth Amendment for proper searches of persons under supervision- 1) procedures for "special needs" searches that satisfy the Fourth Amendment or 2) the person under supervision must have agreed to a search condition, with the resulting search satisfying the reasonableness requirement of the Fourth Amendment. *Williams*, 417 F.3d at 378, *citing Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) and *United States v. Knights*, 534 U.S. 112, 117-118 (2001). The defendant in *Williams* was a State of Pennsylvania parolee who had consented to a search condition that permitted a search of his person, property, or residence without a warrant. 417 F.3d at 374. This search condition of a parolee affected both sides of the Fourth Amendment "reasonableness" balance – the lessening of the defendant's reasonable expectation of privacy and the enhanced need to supervise the defendant's conduct. *Id.* at 376(citations omitted). Since the Third Circuit previously had interpreted that Pennsylvania search condition to contain an implied requirement that reasonable suspicion support the search and reasonable suspicion existed, the Third Circuit did not need to address whether proof not reaching reasonable suspicion could

part of the conditions of his probation: the defendant must permit the supervising probation officer to enter his home, and the defendant was subject to a **"search of his living quarters, person or vehicle without a warrant at any time by a probation/parole officer."** *See* Government Suppression Hearing Exhibit 9, pp. 2-3 (emphasis in original); Tr. A., pp. 104-108. That the defendant in *Samson* was on parole, while the defendant in the case at bar was on probation (Tr. A., pp. 17-18, 102-108; Government's Suppression Hearing Exhibit 9, pp. 2-3) is not a sufficiently distinguishing factor because the Third Circuit has stated in a pre-*Samson* decision that, for Fourth Amendment purposes, there is no constitutional difference between probation and parole. *See United States v. Williams*, 417 F.3d 373, 376, n.1 (3d Cir. 2005)(citation omitted).[6]

Additionally, it is not constitutionally outcome determinative that the California state statute and the search condition of parole in *Samson* specifically mentioned searches without cause (*Samson*, 126 S.Ct. at 2196), whereas Delaware law requires reasonable grounds for a probation search [*see Fuller v. State of Delaware*, 844 A.2d 290, 292-293 (Del. Supr. 2004)] and the defendant's specific conditions of probation required him to permit  the supervising probation officer to enter his residence and subjected him to a search of his living quarters, person, or vehicle without a warrant at any time by a probation officer [*see* Government's Suppression Hearing Exhibit 9, pp. 2-3]. *Griffin v.*

---

justify the search. *Id.* at 376, 376, n. 2 and 378. This Court in the past has used the reasonable suspicion standard to review administrative searches by Delaware probation officers. *See, e.g., United States v. Bowers*, No. 04-133-KAJ, 2006 WL 1537378 at *5 (D.Del. June 5, 2006), *citing United States v. Knights*, 534 U.S. 112, 121 (2001).

[6]*Samson* stated that "[p]arolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." *Samson*, 126 S.Ct. at 2198. Additionally, *Samson* reasoned  that the incentive to hide criminality "applies with even greater force to parolees." *Samson*, 126 S.Ct. at 2201(citations omitted). Still, *Samson* left open the question (decided previously in this Circuit by *Williams*) whether the constitutional analysis would be different.

*Wisconsin*, 483 U.S. 868, 880, n. 8 (1987)(if the search satisfies the Fourth Amendment's requirement of reasonableness, it is irrelevant to the constitutional analysis that state regulations might have been violated); *United States v. Chirino*, 483 F.3d 141, 149 (2d Cir. 2007)("[w]hile state-law rules and practices might inform our evaluation of the totality of the circumstances [in a probation search case], 'the appropriate inquiry for a federal court considering a motion to suppress evidence seized by state police officers is whether the arrest, search, or seizure violated the Fourth Amendment... because the exclusionary rule is only concerned with deterring Constitutional violations.'" *Id.* (citations omitted).[7] "The touchtone of the Fourth Amendment is reasonableness, not individualized suspicion. Thus, while [the Supreme Court's] jurisprudence has often recognized that, to accommodate public and private interests some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure, ...

---

[7]The *Chirino* Court did not need to determine whether the Fourth Amendment permits a suspicionless search of probationers because of the existence of reasonable suspicion for the probation search in the case before the Court. 483 F.3d at 149. The concurring judge in *Chirino* stated his opinion that a quantum of evidence less than reasonable suspicion may justify the search of the residence of a felon on probation and that "the propriety of [a suspicionless search of a probationer without the existence of a "special need" or similar circumstance] would present an open question of constitutional law in this Circuit after *Samson*." 483 F.3d at 150 (McLaughlin, J., concurring). *But see United States v. Amerson*, 483 F.3d 73, 75, 79 and 79, n.6 (2d Cir. 2007)(In reviewing a challenge by two probationers to the 2004 DNA Act's requirement that convicted federal felons supply their DNA for analysis and storage in a national database, the Second Circuit used the "special needs" test "[b]ecause the Supreme Court has not, to date, held that the expectation of privacy of *probationers* are sufficiently diminished to permit probationer suspicionless searches to be tested by a general balancing test – and, to the contrary, in *Samson* the Court expressly acknowledged that probationers have a greater expectation of privacy than [ ] parolees..."), *pet. for cert. filed* July 3, 2007 (No. 07-5140); *United States v. Freeman*, 479 F.3d 743, 748 (10th Cir. 2007)("*Samson* does not represent a blanket approval for warrantless parolee or probationer searches by general law enforcement officers without reasonable suspicion; rather, the Court approved the constitutionality of such searches only when authorized under state law. Kansas has not gone so far as California in authorizing such searches, and this search therefore was not permissible in the absence of reasonable suspicion.").

[the Supreme Court has] also recognized that the Fourth Amendment imposes no irreducible requirement of such suspicion." *Samson v. California*, 126 S.Ct. 2193, 2201, n. 4 (2006)(internal quotation marks and citation omitted).

Although the Supreme Court in *Samson* sanctioned even a suspicionless search of a person under supervision, this Court need not go so far in the case at hand because the totality of the circumstances known to Probation Officer Dupont before the search of the defendant's residence by probation officers exceeded the suspicionless standard and satisfied the Fourth Amendment's requirement of reasonableness. *See* pages 20-24 *infra*; Tr. A., pp. 17-18, 102-108, 120-126, 169-176; Government's Suppression Hearing Exhibit 9, pp. 2-3.[8] *Samson v. California*, 126 S.Ct. 2193, 2201, n. 4 (2006)(internal quotation marks and citation omitted). In reviewing the search of a person under supervision for "reasonableness," courts consider the totality of the circumstances and balance the level of the intrusion of the search on the defendant's privacy against the need to conduct the search to advance proper governmental interests. *Samson*, 126 S.Ct. at 2197(citation omitted); *United States v. Knights*, 534 U.S. 112, 118-119 (2001).[9]

"[P]robationers do not enjoy the absolute liberty to which every citizen is entitled." *Knights*, 534 U.S. at 119(internal quotation marks and citation omitted). A defendant's probation status permits the curtailment of some of his rights by reasonable

---

[8]In both *Knights* and *Samson*, the searches of the probationer's residence and the parolee's person respectively were conducted by police officers. *Knights*, 534 U.S. at 115; *Samson, 126 S.Ct. at 2196.*

[9]In *Knights*, the Supreme Court held that "the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house." *Id.* at 121. Given the existence of reasonable suspicion for the probation search in *Knights*, the Supreme Court left open the question of whether suspicionless searches of probationers violate the Fourth Amendment. *Knights*, 534 U.S. at 120, n.6.

conditions. *Knights*, 534 U.S. at 119.    In determining the extent of a probationer's
reasonable expectation of privacy, courts take into account that the probation order
contained a probation search condition and that the probationer was informed of that
condition. *Samson*, 126 S.Ct. at 2197, *citing Knights*, 534 U.S. at 119-120. The defendant
in this case is a probationer and had signed that he either read or had read to him the
conditions of that probation and that he consented to, and fully understood those
conditions. Tr. A., pp.  17-18, 102-106; Government Suppression Hearing Exhibit 9, p.3.
These conditions of probation included:

- the defendant must not commit a new criminal offense;
- the defendant must permit the supervising probation officer to enter his home;
- the defendant must advise his supervising probation officer within 72 hours of
  any changes in employment or residence;
- the defendant must not possess or use a controlled substance without a
  prescription; and
- the defendant was subject to a **"search of [his] living quarters, person or
  vehicle without a warrant at any time by a probation/parole officer."**

Tr. A., pp. 102-106; Government Suppression Hearing Exhibit 9, pp. 2-3*(emphasis in
original).*

Moreover, important public interests are at stake. Governmental interests
promoted by searches of probationers include rehabilitation of the probationer for a
successful return to the community and safeguarding the community from new crimes by
the probationer. *Knights*, 534 U.S. at 120-121. Recidivism is an important concern
because: 1) "the probationer is more likely than the ordinary citizen to violate the law;"
2) "[t]he recidivism rate of probationers is significantly higher than the general crime
rate;" and 3) probationers have an extra reason to hide or get rid of inculpatory objects
before those objects are seized, given that probationers know that their activities are

being monitored by probation officers and that violation of probation hearings are not subject to all the procedural requirements of trials. *Id.* at 120 (citations omitted).

When considering the totality of the circumstances in deciding whether a search is reasonable and satisfies the Fourth Amendment, the Court even "need not rule out the possibility of innocent conduct." *United States v. Arvisu,* 534 U.S. 266, 277 (2002)(citation omitted). The pertinent question for innocent conduct that is part of the totality of the circumstances is not whether the conduct is innocent, but rather the level of suspicion that corresponds to certain types of otherwise innocent conduct. *United States v. Sokolow,* 490 U.S. 1, 10 (1989)(citation omitted). An officer's experience and specialized training concerning the facts may be used to reach conclusions justifying the reasonableness of a search. *United States v. Nelson,* 284 F.3d 472, 474-475, 482 (3d Cir. 2002)(citations omitted).

Furthermore, certain factors that by themselves do not constitute adequate justification for a search, can be used as part of the basis for finding the existence of sufficient justification for the search. *United States v. Brown,* 448 F.3d 239, 251 (3d Cir. 2006)(citations omitted). These factors include the defendant's nervous and evasive conduct and that the defendant was present in a high crime area. *Id.*[10] Additionally, proximity to a criminal is another such factor in the totality of the circumstances. *United States v. Coggins,* 986 F.2d 651, 655 (3d Cir. 1993)(citation omitted) (although insufficient by itself to constitute reasonable suspicion, "mere association with a known

---

[10]*But cf. United States v. Bonner,* 363 F.3d 213, 215-216 (3d Cir. 2004)(the Third Circuit found not clearly erroneous the District Court's ruling that an average of 1.3 weekly arrests that were mostly for misdemeanors and summary offenses in a housing project did not make the housing project a high crime area and that the hour of the stop at 11:40 p.m. was not significant, when the District Court was ruling on the whether "reasonable suspicion" existed).

criminal" is one factor in the totality of the circumstances to be considered in making the determination as to the existence of reasonable suspicion); *cf., Wyoming v. Houghton,* 526 U.S. 295, 304-305, 307 (1999)(in search context in which the court upheld the probable cause to search the property in the car capable of holding the object of the search, the court stated that "a car passenger ... will often be engaged in a common enterprise with the driver").[11] Another such factor is the defendant's prior arrest record. *United States v. Conley,* 4 F.3d 1200, 1207 (3d Cir. 1993)(citations omitted)("The use of prior arrests and convictions to aid in establishing probable cause is not only permissible, ... but is often helpful ... especially so where ... the previous arrest or conviction involves a crime of the same general nature" as the one for which the search is seeking to discover evidence).

In cases involving allegations of drug activity, unexplained cash is probative of the commission of those crimes. *United States v. Chandler,* 326 F.3d 210, 214-216 (3d Cir. 2003)(citation omitted)(possession of $8200 over 6 months, or approximately $45.56 per day that was not reported to the IRS was admissible proof that the money might be derived from drug distribution). *See also Maryland v. Pringle,* 540 U.S. 366, 371-372, 372, n. 2 (2003)($763 in cash in glove compartment is one factor to be considered in the

---

[11]*But see United States v. McCray,* 148 F.Supp. 2d 379, 387-388, 391 (D.Del. 2001)(citation omitted)("[p]roximity to a drug dealer can be a factor that gives rise to reasonable suspicion," but officers did not have reasonable suspicion to stop the defendant in a high crime area when the defendant was in his own neighborhood at 10:45 p.m. in the summer and possibly in the vicinity of a person the police believed was part of a drug deal).

totality of the circumstances to arrest the defendants who were in the car for the drugs seized therein).[12]

Moreover, in the search context, the Third Circuit has reasoned that direct evidence tying the search location to the offense is not necessary and that legal justification for the search can be inferred based upon the crime, the objects of the search, the defendant's opportunity to hide the objects, and the "normal inferences" concerning likely hiding places for the proceeds of the crime. *United States v. Hodge*, 246 F.3d 301, 305-306 (3d Cir. 2001)(citations omitted). Courts may "'give considerable weight'" to the opinion of an experienced officer concerning the likely storage location for evidence of the crime in question. *Hodge*, 246 F.3d at 307 (citations omitted). A defendant's residence that is within the city in which he is delivering drugs may make that residence more likely to contain evidence of his drug trafficking. *Id.* at 307 (citation omitted).

Before the search of the defendant's residence, Probation Officer Dupont[13] knew the following information:

1.      from experience, he knew that the defendant was stopped in a high drug distribution area (Tr. A., pp. 87, 91, 108-109, 113); [14]

---

[12]*But see United States v. Howard*, 210 F.Supp.2d 503, 516 n. 11 (D.Del. 2002)(in frisk context in which money was seized, that the defendant, who was on probation for trafficking in cocaine and who was unemployed, possessed "relatively small" amount of money [$361.00] was not "sufficient to make it immediately apparent that the cash was obtained through illegal means").

[13]Officer Dupont has been a Delaware State Probation Officer for approximately seven years. Tr. A., p. 87. He is experienced in, and has received training on drug investigations. Tr. A., pp. 100-101; Government Suppression Hearing Exhibit 6. Moreover, he is experienced in conducting law enforcement activity in the Wilmington areas referenced in this Brief, areas within approximately one mile of each other, and he has participated in over fifty drug or weapon arrests in the referenced areas. Tr. A., pp. 91, 108-109.

[14] *Brown*, 448 F.3d at 251(citations omitted).

2.      the defendant was a passenger in a car in that area and Officer Dupont knew

from information from at least three persons within the last month that the car

had been operated in that area by a person involved in the distribution of drugs

there (Tr. A., pp. 33, 35-38, 88-92, 110, 113, 139, 157-158, 161);[15]

3.      the defendant lied and used a false name and date of birth at the scene of the

traffic stop and the defendant falsely told Officer Dupont that he did not have

identification with him (Tr. A., pp. 87, 92-94, 98-99, 110-113);[16]

4.      shortly thereafter, the defendant attempted to conceal his identification card,

but Officer Dupont caught him and learned the defendant's true name (Tr. A.,

pp. 87, 98-99, 110, 113);[17]

5.      a warrant check revealed that the defendant had three active capiases: one

capias issued from the Superior Court of the State of Delaware for failure to

appear at a violation of probation hearing and two capiases issued from cases

---

[15] *See pages 19-20, supra, citing Wyoming v. Houghton*, 526 U.S. 295, 304-305, 307 (1999 and *United States v. Coggins*, 986 F.2d 651, 655 (3d Cir. 1993)(citation omitted). On cross-examination, Officer Dupont stated that the information concerning the car was not part of the totality of the circumstances he used to justify the search (Tr. A., p. 139), but on direct and re-direct examinations, he testified that the driver of the car, the money and the location played a part in the totality of the circumstances for his justification to search the defendant's residence (Tr. A., pp. 110, 161).

[16] *See page 19, supra, citing Brown*, 448 F.3d at 251(citations omitted)(evasive behavior is a factor in the analysis of reasonable suspicion). *See also United States v. Sanchez*, No. 03-030449, 2004 WL 1738006, at * 1 (9th Cir. Aug. 2, 2004)(unpublished opinion)("In view of Andrade's attempt to conceal his actual address from [Probation] Officer Cooper, we hold a probationary search of the apartment was justified to determine whether Andrade was otherwise complying with the terms of his probation").

[17] *See page 19, supra, citing Brown*, 448 F.3d at 251(citations omitted).

in the Family Court of the State of Delaware for failure to appear for a hearing

on support arrears (Tr. A., pp. 99, 102, 110-113);[18]

6.    from a criminal history check that the defendant had prior arrests, including

the following seven sets of drug charges in an approximately ten year period,

with the last arrest occurring approximately six months prior to the probation

search in this case:[19]

| arrest date | charge |
| --- | --- |
| 8/20/06 | possession of marijuana |
| 12/14/04 | conspiracy second degree; distribution, delivery or possession of a controlled substance; possession of a controlled substance; and loitering for drug-related activity |
| 12/8/04 | distribution, delivery or possession of a controlled substance; possession of a controlled substance; and loitering for drug-related activity |
| 2/27/01 | possession of a controlled substance |

---

[18]*United States v. Trujillo*, 404 F.3d 1238, 1245 (10th Cir. 2005)(a failed and refused drug test by the parolee, plus information from a police officer that the parolee was under investigation for the distribution of drugs constituted reasons to believe that the defendant violated his parole and, "[o]nce there was reason to believe that [the defendant] violated his parole agreement, there is, by definition, reasonable suspicion to support a search of his residence to 'ensure compliance' with the conditions of his parole").

[19]*See page 20, supra, citing United States v. Conley*, 4 F.3d 1200, 1207 (3d Cir. 1993)(citations omitted). *See also United States v. Keith*, 375 F.3d 346, 347-348, 351 (5th Cir. 2004)(the defendant's prior record for building and exploding pipe bombs, plus his new purchase of otherwise lawful pipe nipples and end caps, constitute reasonable suspicion justifying a probation search of his residence).

| arrest date | charge |
|---|---|
| 5/10/97 | possession with intent to deliver a controlled substance; distribution, delivery or possession of a controlled substance; possession of drug paraphernalia; and loitering for drug-related activity |
| 4/9/97 | delivery of a controlled substance; distribution, delivery or possession of a controlled substance; and conspiracy second degree |
| 11/3/96 | loitering for drug-related activity |

Tr. A., pp. 17-18, 100-103, 113; Government's Suppression Hearing Exhibit 7;

7.      the defendant possessed a wad of a little over $500 in cash, while the

defendant was wanted for two capiases from Family Court for failing to appear

for hearings on support arrears (Tr. A., pp. 100-102, 110, 113);[20]

---

[20]*See pages 20-21, supra, citing United States v. Chandler*, 326 F.3d 210, 214-216 (3d Cir. 2003) and *Maryland v. Pringle*, 540 U.S. 366, 371-372, 372, n. 2 (2003). The defendant's voluntary statements concerning the cash taken in violation of *Miranda* are properly considered in assessing the justification for a search. *United States v. DeSumma*, 272 F.3d 176, 180-181 (3d Cir. 2001)("We hold that the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued. Thus, even though the defendant's seized gun was secured as a result of his non-Mirandized statement, it was properly admitted"). *See also United States v. Morales*, 788 F.2d 883, 886-887 (2d Cir. 1986)(unwarned statement was a proper basis for probable cause to arrest). Additionally, since the Fourth Amendment test for reasonableness requires a review of the totality of the circumstances [*Samson*, 126 S.Ct. at 2197(citation omitted)], the evidence of the cash must be taken in context. The defendant possessed this cash while in that high drug distribution area. *See* pages 19 and 21, *supra* of this brief. Officer Dupont knew that the defendant was a passenger in a car in that area and knew from information provided to him that the car had been operated in that area by a person involved in the distribution of drugs there. *See*

8.      these facts are consistent with a violation of probation for committing a drug

        offense (Tr. A., pp. 87, 110, 113, 131-132);[21]

9.      the defendant lived less than one mile from the scene of the traffic stop (Tr. A.,

        87, 108, 113-114);[22] and

10.     evidence concerning any drug offense would likely be stored in the

        defendant's nearby residence (Tr. A., pp. 87, 113-114).[23]

        The totality of the above facts, as viewed through the lens of the experienced

probation officer, and considered in light of the balance of the defendant's diminished

expectation of privacy, given his status a probationer subject to a search condition, and

the important governmental interests of rehabilitation of the probationer for a successful

return to the community and safeguarding the community from new crimes by the

probationer, demonstrates that the probation officer acted reasonably in searching the

defendant's residence. Consequently, the Government respectfully requests that the Court

deny the defendant's suppression motion.[24]

---

page 22, *supra*. The defendant was facing capiases -- one capias for a failure to appear
for a violation of probation hearing and two capiases for failure to appear for Family
Court support arrears. *See* pages 22-23, *supra*. Finally, the probation officer did not need
to accept the defendant's statements concerning his "under the table" employment as
true, for reasons including the defendant's earlier lie about his identity and attempt to
conceal his identification card. *See* pages 22-23, *supra*.

        Also, the testimony of Officer Fox and Officer Dupont differed on the
denominations of the money. Tr. A., pp. 74-75, 140-141, 147-149. However, Officer
Dupont testified that, in his thought process, the denominations of the money was only a
minor part in the totality of the circumstances that justified the search. Tr.A.,p. 149.

        [21]*See page 19, supra, citing United States v. Nelson*, 284 F.3d 472, 478, 482 (3d
Cir. 2002)(citations omitted).

        [22]*See page 21, supra, citing Hodge*, 246 F.3d at 307 (citations omitted).

        [23]*See page 21, supra, citing Hodge*, 246 F.3d at 307 (citations omitted).

        [24]If the Court finds that the probation officer was legally justified in entering the
defendant's residence to conduct a probation search either because (a) the search
conditions requiring the defendant to permit the supervising probation officer to enter his

### b. *The probation officer had reasonable suspicion to search the defendant's home.*

At most, the standard against which the search of the defendant's residence is to be judged is "reasonableness." *Samson v. California*, 126 S.Ct. 2193, 2197 (2006)(citation omitted); *United States v. Knights*, 534 U.S. 112, 118 (2001)(citation omitted). In evaluating the "reasonableness" of a search, courts review the totality of the circumstances and weigh the extent of the intrusion on the defendant's privacy versus the need to perform the search to advance proper governmental interests. *Samson*, 126 S.Ct. at 2197(citation omitted); *Knights*, 534 U.S. at 118-119. In *Knights*, the Supreme Court held that "the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house." *Id.* at 121.

Reasonable suspicion is shown when, under the totality of the circumstances, the probation officer possesses "a particularized and objective basis for suspecting legal wrongdoing." *United States v. Williams*, 417 F.3d 373, 376 (3d Cir. 2005), *quoting United States v. Arvisu*, 534 U.S. 266, 273 (2002)(internal quotation marks omitted). Although the reasonable suspicion standard is not satisfied by hunches, the standard does not require that the evidence reach the heights of probable cause and the standard is considerably less than preponderance of the evidence. *Arizu*, 534 U.S. at

---

residence, and advising the defendant that he was subject to a warrantless search of his residence at any time by a probation officer, coupled with the facts known to the probation officer, made the search reasonable, or (b) reasonable suspicion justified the search, as advanced on pages 26-28, *infra*, the gun under the mattress of the defendant's mother seized from her bedroom should also not be suppressed because the defendant has not shown that he had a reasonable expectation of privacy in that bedroom so as to support a motion to suppress on Fourth Amendment grounds. *Rawlings v. Kentucky*, 448 U.S. 98, 104-106 (1980)(citations omitted); *State of Ohio v. Hill*, 713 N.E.2d 73, 75-77 (Ohio App. 2 Dist. 1998)(citations omitted).

274 (citations omitted).    Additionally, as previously stated, "[a] determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct." *Id.* at 277(citation omitted). In deciding whether reasonable suspicion has been shown, the appropriate question for innocent conduct that is being reviewed under of the totality of the circumstances test is the extent of suspicion relating to some otherwise innocent conduct. *United States v. Sokolow*, 490 U.S. 1, 10 (1989)(citation omitted). An officer may use his experience and specialized training to reach conclusions about reasonable suspicion from the facts presented to him. *United States v. Nelson*, 284 F.3d 472, 474-475, 482 (3d Cir. 2002)(citations omitted). Since the test considers the totality of the circumstances, factors that by themselves do not constitute reasonable suspicion, can be used as part of the basis for finding the existence of reasonable suspicion. *United States v. Brown*, 448 F.3d 239, 251 (3d Cir. 2006)(citations omitted).

The totality of the circumstances concerning the defendant known to Officer Dupont, including the defendant's prior arrest record for drug-related  charges, prior information from at least three community sources within the last month that the same car in which the defendant was a passenger had been operated in the same area by a person involved in the distribution of drugs there, the high drug-trafficking location in which the defendant had been present in the car that night,  his possession of approximately $500.00 in cash, while a fugitive for two Family Court capiases for hearings for failing to pay support arrears, and the defendant's evasive conduct concerning his true identity constituted reasonable suspicion for an administrative probation search of the defendant's residence. *See* pages 21-25, *supra*. Consequently, the Government respectfully requests that the Court deny this aspect of the defendant's suppression motion.

In conclusion, the United States respectfully requests that the Court deny the defendant's motion to suppress the evidence seized from the defendant's residence pursuant to the probation search because (a) the conditions of the defendant's probation that required him to permit the supervising probation officer to enter his residence and subjected him to a search of his living quarters and person without a warrant at any time by a probation officer decreased the defendant's reasonable expectation of privacy such that the totality of the circumstances known to the probation officer before the search of the defendant's residence satisfied the Fourth Amendment's requirement of reasonableness; and/or (b) reasonable suspicion justified the search.

### 4. The defendant's statements were volunteered and should not be suppressed.

The defendant has moved to suppress statements that he made during, or subsequent to the probation search of his residence. D.I. 14, paragraph 18.  He contends that the statements were made in violation of his *Miranda* rights and should be suppressed. *Id.*  The motion should be denied because the testimony at the evidentiary hearing showed that the defendant volunteered the incriminating statements that he made at his residence on February 18, 2007 and during transports by law enforcement officers on February 18, 2007 and February 20, 2007. Tr. A., pp. 38-42, 59, 78-79, 124-129, 174-175, 184-187.[25]

Volunteered statements by a person in custody do not require *Miranda* warnings to avoid suppression. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966).  *Miranda* warnings

---

[25]The United States does not seek to admit at trial the statements that the defendant made at the scene of the traffic stop or before the search (i.e., the defendant's statements concerning the seized money and his employment status and the defendant's statements that he resided with his mother and in an upstairs bedroom).

are required only for custodial interrogation, with interrogation being defined to include: "express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Calisto*, 838 F.2d 711, 716 (3d Cir. 1988)(internal quotations omitted), *quoting Rhode Island v. Innis*, 446 U.S. 291, 300-302 (1980).

The probation and police officers and the ATF agents did not interrogate the defendant so as to violate *Innis* and *Calisto*. After the probation officers discovered ammunition in the defendant's second floor bedroom, Officer Dupont told the defendant's mother and the defendant blurted out that he had found the ammunition outside and brought it inside to keep it away from his house. Tr.A., pp. 38-40, 78, 120-123, 128-129. After Officer Dupont located the .22 caliber revolver under the mattress in the other upstairs bedroom, and so informed the defendant's mother, the defendant made another unsolicited blurt-out—that he had put that gun under his mother's mattress for her safety. Tr.A.,pp. 38-39, 122-125, 128-129. The defendant's third blurt-out occurred after Probation Officer Cerminaro searched a common first floor area and found a bag with a semi-automatic revolver. Tr.A., pp. 38, 40-41, 78-79, 125-126. The defendant looked in the direction of his mother and said that they got the bag and that he got that outside in the alleyway. Tr.A., pp. 40, 125-126, 128-129.

When Officers Fox and Dupont were transporting the defendant to the police station after the search of his residence and Officer Dupont was talking to Officer Fox about this case being the first case in a new gun initiative, the defendant blurted out that

he found the guns on the side of the house and brought them inside for safety and he put the revolver under his mother's mattress for her safety. Tr.A., pp. 41-42, 126-129.

Approximately two days later, during transportation to the U.S. Marshal's Office, the defendant volunteered in the presence of Special Agent Diane Iardella, Bureau of Alcohol, Tobacco, Firearms & Explosives, that this was all over this little gun he put under his mother's bed and that he took a felony ten years ago. Tr.A., pp. 185-187.

In *Innis*, the Rhode Island Supreme Court reversed a conviction in which the defendant's inculpatory statement was admitted at the trial. *Innis*, 446 U.S. at 296-297. Innis had been charged with a murder that had been committed with a shotgun. *Id.* at 293-294. The police advised Innis of his *Miranda* rights and he requested a lawyer. *Id.* at 294. While driving Innis to the police station, two of the officers discussed the fact that there was a school for handicapped children in the vicinity and the harm that could result if one of the children discovered the loaded murder weapon that had not been recovered. *Id.* at 294-295. Innis offered to take the officers to the missing shotgun. *Id.* at 295. The officers drove Innis back to the search scene. *Id.* An officer re-*Mirandized* Innis and Innis answered that he understood his rights, but that he wanted to help them find the shotgun because of the children in the area. *Id.* Subsequently, Innis took the officers to the field and showed them the location of the shotgun. *Id.* The Rhode Island Supreme Court decided that Innis' statements were in response to interrogation in violation of the *Miranda* rule and reversed Innis' conviction. *Id.* at 296-297. The issue for the U.S. Supreme Court on review was whether the defendant was interrogated in violation of *Miranda*. *Id.* at 293. The Supreme Court ruled that the officers' statements in Innis' presence were not the equivalent of questioning so as to constitute "interrogation" for

30

*Miranda* purposes and vacated the Judgment of the Rhode Island Supreme Court that reversed Innis' conviction. *Id.* at 302-304.

The Third Circuit interpreted *Innis* in *United States v. Calisto*, 838 F.2d 711 (3d Cir. 1988). In *Calisto*, law enforcement officers were searching Calisto's residence. *Id.* at 713. An officer advised Calisto of his *Miranda* rights and Calisto decided to remain silent. *Id.* When an officer located drugs in a second floor bedroom during the search, he called the discovery to an officer who was on the first floor with Calisto. *Id.* The officer who was with Calisto arrested him, and re-advised Calisto of his *Miranda* rights and was told again that Calisto desired to remain silent. *Id.* The officer who seized the drugs told that officer that the bedroom with the drugs contained clothing for both men and women. *Id.* The officer with Calisto replied in a low voice that they would have to get an arrest warrant for Calisto's daughter, at which Calisto made a statement that incriminated himself and exculpated his daughter. *Id.* The District Court refused to suppress Calisto's statement, finding that Calisto's statement was a "blurt-out," not the result of custodial interrogation. *Id.* at 714, 717. The Third Circuit stated that the District Court's ruling included a finding that "Calisto's statement was not a reasonably foreseeable consequence of the conversation between the two police officers." *Id.* at 717. Finally, the Third Circuit upheld the admission of Calisto's statement and reasoned:

> We view this case as very close to the *Innis* case and reach the same conclusion. [The officer's] remark regarding the possible arrest of Calisto's daughter was not directed to Calisto, was the kind of remark that an officer would normally make in carrying out his duties under the circumstances that confronted him, and was not made in a provocative manner. Moreover, it was a single isolated remark made in the presence of a subject who showed no signs of being emotionally upset or overwrought. Finally, even if it could be said that reasonable officers might have expected a protest of some kind from Calisto upon his

hearing of his daughter's possible arrest, we do not think it was reasonable to expect an inculpatory response from Calisto.

*Id.* at 718.

The statements were not made in response to questioning directed at the defendant. Tr.A., pp. 38-42, 55, 59, 78-79, 122-129, 174-175, 184-187. Isolated statements at the scene between officers or between an officer and a non-defendant resident of the place being searched concerning the finding of items such as ammunition and firearms (Tr. A., pp. 40, 122-126) that could present dangers to the officers and increase the danger that the defendant presented to the officers were "the kind of remark[s] that an officer would normally make in carrying out his duties under the circumstances that confronted him, and [were] not made in a provocative manner." *Calisto*, 838 F.2d at 718. The officers' statements were not such that a reasonable officer would expect an inculpatory response by the defendant. *Id.* Consequently, those statements should not be suppressed. The statements that the defendant made during transportation in the presence of Police Officer Fox and Probation Officer Dupont during the night of the defendant's arrest and during transportation February 20th in the presence of Agent Iardella also were unsolicited, volunteered statements, not in response to interrogation. Tr.A., pp. 38-42, 78-79, 126-129, 184-187. As such, those statements should not be suppressed. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966).

Moreover, all the statements that the defendant made, including the statements he made before the search, were voluntary statements and do not require subsequent volunteered statements to be suppressed even if all those statements were not preceded by *Miranda* warnings. Tr.A., pp 38-42, 55, 78-79, 100, 122-129, 149-151. *United States v. Pettigrew*, 468 F.3d 626, 635-636 (10th Cir. 2006), *citing United States v. Abdulla*, 294

F.3d 830, 835 (7th Cir. 2002); *Medeiros v. Shimoda*, 889 F.2d 819, 823-825 (9th Cir.

1989). *Cf. United States v. DeSumma*, 272 F.3d 176, 180-181 (3d Cir. 2001)(holding that

the exclusionary rule did not require suppression of derivative evidence recovered as a

fruit of a voluntary statement that was provided prior to the provision of *Miranda*

warnings). In *Pettigrew*, the Tenth Circuit stated:

> [T]he admissibility of an unsolicited inculpatory statement, following
> a voluntary statement made in violation of *Miranda*, turns on whether the
> inculpatory statement was knowingly and voluntarily made....
> In the absence of coercion or improper tactics, a broader rule would
> "undercut[] the twin rationales of *Miranda's* exclusionary rule] –
> trustworthiness and deterrence."

*Pettigrew*, 468 F.3d at 636, *citing* and *quoting Oregon v. Elstad*, 470 U.S. 298, 308-309

(1985).[26]

The prosecution has the burden of proving the voluntariness of a statement by a

preponderance of the evidence. *Missouri v. Seibert*, 542 U.S. 600, 609, n. 1 (2004), *citing*

*Lego v. Twomey*, 404 U.S. 477, 489 (1972). The Third Circuit looks to the totality of

circumstances in deciding whether a statement was voluntarily given. *United States v.*

*Swint*, 15 F.3d 286, 289 (3d Cir. 1994)(citations omitted). Coercion of the defendant by

law enforcement is a prerequisite to a finding that the defendant's statement was

---

[26]*Cf. United States v. DeSumma*, 272 F.3d 176, 180 (3d Cir. 2001), *quoting*
*United States v. Johnson*, 816 F.2d 918, 922 (3d Cir. 1987)([in *Johnson*,] "we
summarized *Elstad* as 'specifically reject[ing] the proposition that the 'fruit of the
poisonous tree' doctrine, which in the fourth amendment context requires the exclusion
of evidence or confessions obtained as a result of a constitutional violation, extends to
violations of the *Miranda* decision'"); *but see United States v. Kiam*, 432 F.3d 524, 531-
533 (3d Cir. 2006)(citation omitted)(if government personnel intentionally "flouted" the
*Miranda* rule in the first round of questioning, the prosecution must prove the existence
of some factor such as an adequate interruption of time or circumstance between the first
and second interviews or such as an explanation to the defendant that the non-*Mirandized*
first statement could not be used, before the second statement is admissible. If the
*Miranda* violation concerning the first statement was not intentional, the *Elstad*
voluntariness test applies to the admissibility of the second statement).

involuntarily given. *Swint*, 15 F.3d at 289, *citing Colorado v. Connelly*, 479 U.S. 157, 164, 167 (1986). Other factors to be considered in this totality of the circumstances analysis include the length of the interview, the location of the interview, the defendant's age, the defendant's physical condition, the defendant's mental condition, and the defendant's prior experience with the criminal justice system. *Swint*, 15 F.3d at 289 (citations omitted); *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005)(citations omitted).

In the case at bar, the defendant's above-referenced statements at his residence and during each of the transports were unsolicited and volunteered. Tr.A., pp. 38-42, 55, 59, 78-79, 124-127, 129, 174-175, 184-187. The defendant was 31 or 32 years old when he made the statements. Tr.A., p. 128. He was coherent and did not appear to be under the influence of alcohol or drugs. Tr.A., pp. 39, 129, 174-175, 187. The record does not show that either the probation and police officers or the ATF agents made any threats or promises to the defendant or that they used physical force except to the extent necessary to handcuff the defendant. Tr.A., pp. 38-39, 59, 128, 186-187. Time gaps occurred between the statements made in response to questioning and the unsolicited statements. Tr. A., pp. 13-16, 36, 39-42, 48, 71, 84-85, 92-100, 115, 117-120, 124-128, 69-171, 184-187.[27] *See Pettigrew*, 468 F.3d at 637-638(upholding admissibility of volunteered

---

[27]The record shows the following. The defendant's statements concerning the amount of money in his possession and his work as a painter under the table [Tr.A., pp. 100, 151], and the fact that he resided in an upstairs bedroom and with his mother who should be home [Tr.A., pp. 117-118, 150], occurred between the time of the stopping of the car in which the defendant was riding (approximately 11:59 p.m. on February 17th [Tr.A., pp. 13, 35-36; Government's Suppression Hearing Exhibit 10]) and the beginning of the search of his residence (approximately 12:20 a.m. on February 18th [Tr. A., pp. 71, 116, 160]). Officer Dupont's questions were direct and brief. Tr.A., p. 150. The above statements concerning the money took approximately 15 seconds. Tr. A., p. 100, 150-

statement made 30 minutes after first *unMirandized* custodial interview); *Medeiros*, 889

F.2d at 825 (upholding admissibility of second statement in which there was a 30 minute

time lapse between unMirandized custodial first interview and volunteered second

statement); *but see United States v. Brunswick*, Cr. A. No. 01-66-JJF, 2002 WL

31466451 at *1-2, 5-6 (D.Del. November 4, 2002)(finding that the defendant's

*unMirandized* statement approximately 25-30 minutes after the first *unMirandized*

interview was not spontaneous and volunteered and alternatively, the time lapse between

the two statements was insufficient to cure the effects of the impropriety in the first

statement). At the time of his statements, the defendant had considerable experience with

the criminal justice system, including the previously mentioned seven sets of drug

charges over the last approximately 10 years. Tr.A., pp. 17-18, 101-103; Government's

Suppression Hearing Exhibit 7. In sum, the factors in the totality of the circumstances

demonstrate that the defendant voluntarily provided the unsolicited statements during

each of the transports and that those statements should not be suppressed.[28]

---

151. The above statements about the residence lasted approximately 30 seconds. Tr. A.,
pp. 117-118, 150. The defendant's inculpatory statement concerning the ammunition
occurred during the search of his residence. Tr.A.,pp. 120-123. The defendant's first
incriminating statement concerning the revolver under his mother's mattress occurred
after the first admission and after Officer Dupont went back upstairs, found that gun, and
returned downstairs. Tr.A.,pp. 122-125. The defendant's first admission concerning the
gun in the bag occurred after the preceding statement and after Officer Cerminaro
discovered the bag with the gun. Tr.A.,pp. 120-126. The defendant's next inculpatory
statements about the guns occurred after the search and during the transportation to the
Wilmington Police station. Tr.A.,pp. 126-127. The defendant's final admissions
concerning the revolver under his mother's mattress and his prior felony occurred two
days later during the transport to the Marshal's Office. Tr.A.,pp. 185-186.
[28] Even if the Court suppresses the defendant's statements for violation for the
*Miranda* rule, the prosecution may use the defendant's statements to impeach the
defendant's testimony. *Harris v. New York*, 401 U.S. 222, 225-226 (1971).

In conclusion, the testimony showed that the defendant volunteered the statements made in his residence on February 18, 2007 and during the transports on February 18th and February 20th and the United States respectfully submits that the Court should deny the defendant's motion to suppress those statements.[29]

## CONCLUSION

For the above-stated reasons, the United States respectfully requests that the Court deny the defendant's motion to suppress.

Respectfully submitted,

COLM F. CONNOLLY
UNITED STATES ATTORNEY

BY: *Robert J. Prettyman*
Robert J. Prettyman
Assistant U.S. Attorney
1007 N. Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899-2046

Dated: July 17, 2007

---

[29]Moreover, even if the Court suppresses the voluntary statements that the defendant made at his residence because those statements at his residence should have been, but were not preceded by *Miranda* warnings, the volunteered statements made during each of the transports should not be suppressed. *United States v. Pettigrew*, 468 F.3d 626, 635-636 (10th Cir. 2006), *citing United States v. Abdulla*, 294 F.3d 830, 835 (7th Cir. 2002); *Medeiros v. Shimoda*, 889 F.2d 819, 823-825 (9th Cir. 1989). *Cf. United States v. DeSumma*, 272 F.3d 176, 180-181 (3d Cir. 2001)(holding that the exclusionary rule did not require suppression of derivative evidence recovered as a fruit of a voluntary statement that was provided prior to the provision of *Miranda* warnings).

## CERTIFICATE OF SERVICE

I, Theresa A. Jordan, an employee with the United States Attorney's Office, hereby

certify that on July 17, 2007, electronically filed the foregoing:

**POST-HEARING BRIEF
OF THE UNITED STATES TO DEFENDANT'S
AMENDED MOTION TO SUPPRESS**

with the Clerk of the Court using the CM/ECF which will send notification of such filing to:

Edson Bostic, Esquire
Assistant Federal Public Defender
704 King Street, Suite 110
Wilmington, Delaware 19801

*Theresa A. Jordan*