IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 07-25-JJF |
| | : | |
| ROBERT COTTMAN, | : | |
| | : | |
| Defendant. | : | |


**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS
PHYSICAL EVIDENCE AND STATEMENTS**

Defendant, Robert Cottman, by and through his undersigned counsel, Edson A. Bostic,

Federal Public Defender for the District of Delaware, respectfully submits this Memorandum of Law

in support of his Motion to Suppress Physical Evidence and Statements.  For the reasons set forth

below, Mr. Cottman seeks to exclude the Government's admission, at trial, of any and all evidence

that was obtained after Mr. Cottman's illegal seizure and the impermissible search of his home on

February 17-18, 2007, and all statements obtained in violation of his Fifth Amendment rights.


**I.  INTRODUCTION**

On February 27, 2007, Mr. Cottman was indicted for being a felon in possession of a loaded

firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and being a felon in possession of

ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  On May 25, 2007, Mr. Cottman

filed an Amended Motion to Suppress Physical Evidence and Statements.  The grounds for Mr.

Cottman's motion related to his illegal seizure on or about February 17, 2007, and the administrative

search of his home on February 18, 2007.  On June 7, 2007, and July 9, 2007, this Court conducted evidentiary hearings to determine Mr. Cottman's suppression motion.

Mr. Cottman submits that law enforcement officials lacked probable cause and/or reasonable suspicion to conduct the traffic stop which led to his arrest, in violation of his Fourth Amendment rights.  See United States v. Sharpe, 470 U.S. 675 (1985).  Thus, any evidence derived from this illegal search and seizure must be suppressed as "fruit of the poisonous tree."  Wong-Sun v. United States, 371 U.S. 471 (1963).

Mr. Cottman further submits that law enforcement officials lacked reasonable suspicion to conduct the administrative search of his home.  See United States v. Bowers, No. CRIM.A 04-133 JJF, 2005 WL 1979142 (D.Del. Aug. 15, 2005).  Thus, any evidence derived from this illegal search and seizure must be suppressed as "fruit of the poisonous tree."  See Wong-Sun, 371 U.S. at 471.

Additionally, Mr. Cottman submits that his statements were obtained in violation of his Fifth Amendment rights and Miranda v. Washington, 384 U.S. 436 (1966).  Thus, Mr. Cottman's statements must be suppressed and excluded at trial.


## II.  FACTUAL BACKGROUND

### A.  Investigative Report Summary[1]

On February 17, 2007, Officers Robert Fox and Hank DuPont patrolled in the area of 4th and Clayton Streets.  While at this intersection, officers observed a vehicle that was driven by an individual allegedly known to officers.  The officers allegedly believed that this individual had a

---

[1]  Mr. Cottman recounts the facts contained in the officers' investigative report because of the officers' contradictory testimony in this matter.

suspended or revoked driver's license and conducted a traffic stop of the vehicle.

After approaching the vehicle, officers observed Mr. Cottman sitting in the passenger seat. Specifically, Officer DuPont asked Mr. Cottman for his identification. Mr. Cottman responded that he did not have identification, and that his name was "Bryan Cottman." As Officer DuPont checked this name through the DELJIS system, he observed Mr. Cottman reach inside of his right back pocket and retrieve his wallet. Mr. Cottman allegedly removed his identification from his wallet and attempted to conceal it under his right leg.

Officer DuPont demanded that Mr. Cottman turn over the identification card, and contemporaneously reached into the vehicle and grabbed the card from Mr. Cottman. After examining the card, Officer DuPont discovered that Mr. Cottman's name was not "Bryan," but rather, "Robert V. Cottman, III." Officer DuPont conducted a DELJIS inquiry and discovered that Mr. Cottman, who was on probation for a prior felony conviction, was wanted for violation of probation and two family court capiases. Officer DuPont removed Mr. Cottman from the vehicle, took him into custody and contacted his probation supervisor to authorize an administrative search.

On February 18, 2007, Delaware State Probation and Parole officers and Wilmington Police Department officers conducted an administrative search of Mr. Cottman's address of record. After arriving at the residence, officers contacted Beverly Cottman, Mr. Cottman's mother. Mr. Cottman and his mother sat in the living room while the officers conducted the search.

During the search, Delaware State Probation officers found three boxes of ammunition in Mr. Cottman's bedroom, and a Delaware Family Court Civil Notice. According to officers, Mr. Cottman stated that he found the ammunition outside of the house and brought it in to "get them away from my house."

Officers also found a firearm under Mr. Cottman's bed, and a firearm inside of a gym bag in a first floor storage room. The gym bag also contained empty plastic baggies bearing various logos. The officers asked Ms. Cottman about the firearm, and Mr. Cottman allegedly responded that he found the gun outside and put it in his mother's room for protection. After Mr. Cottman overheard the officers locate the second gun, he allegedly stated to his mother, "they got the bag." Mr. Cottman also allegedly stated that he found the second gun in the alley. The officers prepared a Criminal Complaint and took Mr. Cottman to police headquarters.

### B.  June 7, 2007 Evidentiary Hearing

On June 7, 2007, the Court held an evidentiary hearing on Mr. Cottman's suppression motion. At the hearing, the Government presented five witnesses: (1) Margaret Bell, Executive Director of Delaware Criminal Justice Information Systems (DELJIS); (2) Officer Robert Fox, of the Wilmington Police Department; (3) Officer William DuPont, of Delaware State Probation and Parole; (4) Officer Richard Cerminaro, of the Department of Correction, Probation and Parole; and (5) Diane Iardella, of the Bureau of Alcohol, Tobacco and Firearms and Explosives. Mr. Cottman presented Josue Torres, the driver of the vehicle that was stopped by law enforcement officials.

### 1.  Margaret Bell's Testimony

Ms. Bell testified regarding law enforcement officials' computer inquiry into the status of Josue Torres, the driver of the stopped vehicle. (Tr. 13). Ms. Bell testified that on February 17, 2007, DELJIS staff was asked to run computer inquiries regarding the status of Mr. Torres' license. (Tr. 13). Ms. Bell testified that the DELJIS computer status check on Mr. Torres' license occurred

at "23:58:446," and reported that Mr. Torres' license was suspended.  (Tr. 13, 15).

Ms. Bell further testified that on February 17, 2007, DELJIS staff was asked to run a computer inquiry for "Briant Cottman's" warrant status.  (Tr. 16).  Ms. Bell testified that the DELJIS computer status check for "Briant Cottman" occurred at "23:59:30."  (Tr. 16).

Additionally, Ms. Bell testified that DELJIS staff was asked to run a computer inquiry on "Robert Cottman's" warrant status.  (Tr. 17).  Ms. Bell testified that the DELJIS computer status check for "Robert Cottman" occurred at "00:00.16," or "exactly at midnight," on February 18, 2007 (Tr. 16-17).  Ms. Bell testified that the DELJIS computer status check into "Robert Cottman's" active warrant status and prior arrest history occurred at "00:04 to 00:0015 a.m."  (Tr. 18).  Ms. Bell testified that DELJIS reported that "Robert Cottman" was a "probationer."  (Tr. 18).  Ms. Bell testified, on cross examination, that the DELJIS system query reported wanted status for "Briant Cottman," and his aliases of "Robert Cottman III" and "Bruce Cottman."  (Tr. 28-29).

### 2. Officer Fox's Testimony

Officer Fox testified that on February 17, 2007, he patrolled with Officer DuPont in an unmarked Crown Victoria.  (Tr. 31).  Officer Fox testified that he observed Mr. Cottman riding in the passenger seat of a silver BMW station wagon driven by Josue Torres.  (Tr. 33).  Officer Fox testified that he knew Mr. Torres had a suspended driver's license before he stopped his vehicle.  (Tr. 33, 50-52).  Officer Fox testified that the officers conducted a DELJIS inquiry of Mr. Torres' driving status and the vehicle's registration.  (Tr. 34).

Officer Fox stated that the DELJIS inquiry reported that the car was registered to Gloria Torres, and that Mr. Torres' license was suspended.  (Tr. 34-35).  Officer Fox testified that he

received information regarding the license plate at "23:58 and 11 seconds," and received information regarding Mr. Torres license status at "23:58 and 47 seconds." (Tr. 36). Officer Fox further testified that his police report indicated that the DELJIS status checks occurred at 11:30 p.m., and that he based this time on the officers' initial contact with the vehicle. (Tr. 36-38). Officer Fox testified that the officers conducted a traffic stop of Mr. Torres' vehicle in the 400 block of North Scott Street. (Tr. 38).

Regarding the search of Mr. Cottman's home, Officer Fox testified that Mr. Cottman made several statements regarding the seizure of ammunition and guns. (Tr. 39). According to Officer Fox, after the officers found ammunition in Mr. Cottman's bedroom, he stated that he found it outside and brought it inside to get it away from the house. (Tr. 40). Officer Fox further testified that after officers found the black bag that contained a gun, Mr. Cottman stated, "I got that outside in the alleyway," and told his mother, "They got the bag." (Tr. 40). Officer Fox also testified that on the ride back to the police station, Mr. Cottman stated, "I found those guns outside. I put the .22 under my mom's mattress for protection." (Tr. 42).

On cross examination, Officer Fox testified that, during the traffic stop, he made contact with Mr. Torres and asked Mr. Cottman to provide Officer Dupont with his identification. (Tr. 55). Officer Fox testified that he made a radio transmission regarding "Briant Cottman." (Tr. 55).

Officer Fox testified that Mr. Torres had a State of Delaware identification card instead of his driver's license, which constituted two traffic violations. (Tr. 56). Officer Fox also placed Mr. Torres in handcuffs and put him into the back of the patrol vehicle. (Tr. 58).

Officer Fox denied asking Mr. Torres for permission to search the vehicle and stated that he was verbally combative and "moving around." (Tr. 60). According to Officer Fox's testimony, Mr.

6

Torres stated, "I don't have nothing in my car. You can check it if you want to." (Tr. 60). Officer Fox testified that he subsequently searched the vehicle for approximately five to ten minutes, but found nothing suspicious in the vehicle. (Tr. 60, 71, 74). Officer Fox further acknowledged, during cross-examination, that Mr. Torres stated, "I'm tired of you guys pulling me over and harassing me." (Tr. 60).

Officer Fox also testified that Officer DuPont engaged Mr. Cottman while he secured Mr. Torres. (Tr. at 61). Officer Fox testified that it was during this time that the officers discovered that Mr. Cottman had lied about his name and had a violation of probation warrant. (Tr. 61). Officer Fox stated that he did not observe Mr. Cottman do anything with respect to his identification card during the traffic stop. (Tr. 63).

Officer Fox also testified that he did not give Mr. Torres a traffic citation, but rather, gave a verbal reprimand at the scene. (Tr. 57). Officer Fox testified that he told Mr. Torres to park the vehicle and to have a licensed driver return to get the vehicle. (Tr. 57). Officer Fox testified that the officers left the scene before Mr. Torres entered his vehicle. (Tr. 57).

Officer Fox further testified that he brought Mr. Cottman into his home during the administrative search and heard him make unsolicited statements. (Tr. 76, 78). Officer Fox testified that a Miranda waiver form was subsequently completed at the police station. (Tr. 78). According to Officer Fox's testimony, Mr. Cottman invoked his right to remain silent and to not make any statements. (Tr. 78).

### 3. Officer DuPont's Testimony

Officer DuPont testified regarding the traffic stop of Josue Torres' vehicle, his interaction with

Mr. Cottman and the administrative search of his home.  Specifically, Officer DuPont testified that after the traffic stop, he approached the passenger side of Mr. Torres' vehicle.  (Tr. 93).  Officer DuPont stated that he observed Mr. Cottman slouched down in the front passenger seat, and that he rolled down the window and said, "What's up?"  (Tr. 93).

Officer DuPont testified that he explained to Mr. Cottman that he was being stopped and asked for identification.  (Tr. 93).  According to Officer DuPont, Mr. Cottman stated "no," sat upright and began to "pad around his person and his pants as if attempting to locate an ID."  (Tr. 93).  Officer DuPont stated that Mr. Cottman told him that his name was "Briant Cottman," and provided his date of birth.  (Tr. 94).  Officer DuPont testified that he contacted WILCOM data at approximately 11:57 p.m. and asked for a warrant check on that name.  (Tr. 94).

Officer DuPont also testified regarding radio transmissions from the Wilmington Police Department.  Specifically, Officer DuPont testified regarding Government Exhibit 5, which time stamped the radio transmission regarding "Briant Cottman."  (Tr. 96).  Officer DuPont testified that he received results regarding "Briant Cottman's status at "23:57:01."  (Tr. 97).  Officer DuPont further testified that he received results regarding the status of "Robert Cottman's" name and date of birth at "23:58:48" and "23:59:03."  (Tr. 97).

Officer DuPont testified that during the warrant check inquiry, he watched Mr. Cottman remove a wallet from his right rear pants pocket, and what appeared to be a state-issued identification card.  (Tr. 98).  Officer DuPont testified that Mr. Cottman attempted to conceal the card under his right leg.  (Tr. 98).  Officer DuPont stated that he asked Mr. Cottman to give him the ID card, and Mr. Cottman responded, "What ID?"  (Tr. 98).  Officer DuPont testified that he reached through the open window and removed the ID card from under Mr. Cottman's leg.  (Tr. 99).

8

Officer DuPont testified that he contacted WILCOM for a second time to get a record check for "Robert Cottman." (Tr. 98-99). The warrant check indicated that Mr. Cottman was on probation, and was wanted for failure to appear in Family Court and for violation of probation. (Tr. 99, 102). Officer DuPont removed Mr. Cottman from the vehicle and placed him into custody. (Tr. 99).

Officer DuPont stated that he conducted a patdown search of Mr. Cottman and found money. (Tr. 100). According to Officer DuPont's testimony, Mr. Cottman stated that the amount of money was over $500, and that he was a painter. (Tr. 100). Officer DuPont stated that he asked Mr. Cottman if he could verify his employment, and Mr. Cottman responded, "[n]o, he gets paid under the table." (Tr. 100).

Officer DuPont also testified regarding the administrative search of Mr. Cottman's home. Officer Dupont testified that prior to the search, he saw Mr. Cottman's arrest history and believed that the money found in his possession may be drug proceeds. (Tr. 103, 109). Officer DuPont testified that he decided to contact his supervisor for search approval because of the "large wad of money," Mr. Cottman's location in a high-drug trafficking area and because he lied about his identity. (Tr. 110-112).

Officer DuPont testified that he received permission to conduct the search from Patrick Cronin, his supervisor in the State Probation Department. (Tr. 114). Officer DuPont stated that he told Officer Cronin that he wanted to search Mr. Cottman's home for drugs and drug-related activity. Tr. 116.

Officer DuPont testified that, after receiving approval to conduct the search, the officers took Mr. Cottman to his home and entered it with his key. (Tr. 117-118). Officer DuPont saw Mr. Cottman's mother standing on the stairs, and asked that she come downstairs so that he could speak

9

with her.  (Tr. 118).  Ms. Cottman complied, and the officers moved her to the living room.  (Tr. 118).

Officer Dupont testified that he told Ms. Cottman that the officers were going to conduct an administrative search of her home, and that she told him that Mr. Cottman stayed "on the couch."  (Tr. 119).  Officer DuPont testified that he "confronted her with the fact that [Mr. Cottman] had admitted to me that he stays on an upstairs bedroom," and that Ms. Cottman responded, "[w]ell, he keeps a room upstairs."  (Tr. 119).

Officer DuPont also testified that Officers Stoddard and Cerminaro were present to assist with the search.  (Tr. 120).  Officer DuPont testified that after the search, Officers DuPont and Fox transported Mr. Cottman to the police station.  Officer DuPont testified that Mr. Cottman stated, "You got me.  I found the gun on the side of the house and brought them inside, so they'd be safe."  (Tr. 127).

On cross-examination, Officer DuPont testified that Mr. Cottman was administered Miranda warnings only after he was taken to the police station following the administrative search.  (Tr. 131).  Officer DuPont again testified about the factors leading to his decision to obtain approval to search Mr. Cottman, and the subsequent administrative search.  Officer DuPont stated that he based his decision on Mr. Cottman's location in a high crime area, the amount of small bills in his possession, Mr. Cottman's prior arrest history and association with Mr. Torres.  (Tr. 141).  Officer DuPont testified, however, that he did not have specific information that Mr. Torres was engaged in drug activity.  (Tr. 142).  Officer DuPont confirmed that, prior to the administrative search, no drugs, drug paraphernalia or guns were found in Mr. Torres' vehicle, and that he searched the area in which Mr. Cottman sat.  (Tr. 145).

**4. Officer Cerminaro's Testimony**

Officer Cerminaro testified regarding the traffic stop of Mr. Torres' vehicle and the administrative search of Mr. Cottman's home.  Officer Cerminaro testified that he searched the trunk area of Mr. Torres' vehicle, but did not find any drugs, guns, paraphernalia or contraband.  Tr.  171.  Officer Cerminaro further testified that he seized the ammunition and handgun, and that Officer DuPont seized Mr. Cottman's family court subpoena.  (Tr. 173-75).

**5. Diane Iardella's Testimony**

Agent Iardella testified that, On February 20, 2007, she assisted Special Agent Patrick Fiyock in transporting Mr. Cottman from the State Prison to the Federal Courthouse.  (Tr. 184).  Agent Iardella testified that Mr. Cottman got into the vehicle and stated, "This is all over that little gun I put under my mom's bed.  I'm not out there carrying guns and shooting nobody.  I've been shot.  I'm not messing around like that anymore."  (Tr. 185-86).

**6. Josue Torres' Stipulated Testimony**

After conferring with the Court,[2] the government and defense counsel stipulated that Mr. Torres would testify that he drove the BMW on the night in question, and Mr. Cottman was in the vehicle.  (Tr. 15).  Mr. Torres' vehicle was pulled over by Officer Fox, who approached him and said, "You're driving with your license suspended."  In response, Mr. Torres said, "No way.  I had it taken care of."  (Tr. 15).

---

[2] Mr. Torres' testimony was stipulated to because of concern over his lack of representation and exposure to self-incrimination.  Thus, the stipulation avoided the necessity for Mr. Torres' testimony.

Officer Fox told Mr. Torres to get out of the vehicle, and, in response, Mr. Torres asked, "Why the hell should I get out of the car?" (Tr. 15). Officer Fox again requested that Mr. Torres get out of the car, and he complied. (Tr. 15). Officer Fox handcuffed Mr. Torres and walked him back to the police vehicle. (Tr. 15). Officer Fox then asked him who was in the vehicle, and Mr. Torres responded, "I'm not telling you anything. You're harassing me. You go do your work." (Tr. 15).

Officer Fox put Mr. Torres in the police vehicle and asked permission to search the car. (Tr. 15). Mr. Torres refused to consent to the search. (Tr. 15). Officer Fox then walked back to the stopped vehicle and instructed Officer DuPont to "[g]et Cottman out of the car. We're going to search it." (Tr. 16). Mr. Cottman was handcuffed and brought to the police vehicle. (Tr. 16). Additional vehicles arrived and searched the vehicle. (Tr. 16). After the search was completed, officers informed Mr. Torres that he could leave. (Tr. 16).

## III. ARGUMENT

### 1. Mr. Cottman's Seizure Violated The Fourth Amendment.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." See U.S. CONST. Amend. IV. The United States Supreme Court noted that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Terry v. Ohio, 392 U.S. 1, 9 (1968) (citing Union Pacific R.R. Co. v. Botsford, 141 U.S. 250, 251 (1891).

The Fourth Amendment permits officers to conduct a brief, investigatory stop if the officer has

reasonable suspicion that "criminal activity may be afoot." <u>Terry</u>, 392 U.S. at 30. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief and limited purpose, constitutes a 'seizure of persons' within the meaning of this provision." <u>Whren v. United States</u>, 517 U.S. 806, 809 (1996). <u>See also</u> <u>Brendlin v. California</u>, 127 S.Ct. 2400, 2403 (2007) (holding that when a police officer makes a traffic stop, the passenger, in addition to the driver, is seized and may challenge the constitutionality of a traffic stop); <u>United States v. Mosley</u>, 454 F.3d 249 (3d Cir. 2006) ("[A] traffic stop is a seizure of everyone in the stopped vehicle.").

In "justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with reasonable inferences from those facts, reasonably warrant that intrusion." <u>Terry</u>, 392 U.S. at 21 (stating that this "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence"). <u>See also</u> <u>Whren</u>, 517 U.S. at 810 (stating that an automobile stop is subject "to the constitutional imperative that it not be 'unreasonable' under the circumstances."; <u>United States v. Delfin-Colfina</u>, 464 F.3d 392 (3d Cir. 2006) (stating that a traffic stop will be deemed a reasonable seizure if the police possessed, specific, articulable facts that the individual violated a traffic law at the time of the stop).

As reflected by the DELJIS computer inquiry timestamps and Wilmington Police Department radio transmission timestamps, it is clear that the officers lacked specific, articulable facts to conduct the traffic stop of Mr. Torres' vehicle. Officers Fox and DuPont testified that they confirmed that Mr. Torres' license was suspended, and stopped the vehicle on this basis. Both officers testified that Officer DuPont engaged Mr. Cottman after conducting a traffic stop on the basis of Mr. Torres' license status. The timestamps, however, indicate that the officers made radio transmissions regarding

13

Mr. Cottman's status <u>before</u> they received information regarding Mr. Torres' suspended license.

During direct examination, Officer Fox stated that the traffic stop of Mr. Torres' vehicle was based on his prior knowledge of Mr. Torres' suspended license status, which he confirmed by DELJIS inquiry at "23:58:446." ( Tr. 13). The radio transmission regarding "Briant Cottman's" warrant status, however, was made at "23:57:22," and Officer Fox testified that the officers made initial contact with the vehicle at 11:30 p.m. (Tr. 96).

Officer DuPont testified that he called in the radio transmission regarding "Briant Cottman's" warrant status at "23:57:01," and received the results at "23:53:22." (Tr. 96-97). Officer Dupont also testified that he received radio transmission results regarding "Robert Cottman's" warrant status and date of birth at "23:58:48" and "23:59:03." Based on Officer DuPont's testimony, and the WILCOM inquiry timestamps, the officers called in and knew information regarding "Briant Cottman" and "Robert Cottman" before they knew that Mr. Torres' license was suspended.

Thus, this time-stamped sequence of events and the officers' contradictory testimony demonstrates that the officers, who seized Mr. Cottman and Mr. Torres upon conducting the traffic stop, lacked specific, articulable facts that a traffic violation had been committed prior to conducting the traffic stop. <u>See</u> <u>Terry</u>, 392 U.S. at 21; <u>Delfin-Colfina</u>, 464 F.3d at 392. Thus, the traffic stop was unreasonable under the circumstances, and any evidence subsequently obtained, which included evidence obtained during the subsequent administrative search, must be suppressed as "fruit of the poisonous tree." <u>Wong-Sun v. United States</u>, 371 U.S. 407, 484-485; <u>see</u> <u>also</u> <u>Whren</u>.[3]

---

[3] Mr. Cottman further notes that, although the officers' testimony is contradictory regarding the timeline of when they conducted the traffic stop, the officers also did not articulate any facts to support a reasonable suspicion that Mr. Cottman was presently involved in any criminal activity. <u>See</u> <u>Terry</u>. Courts have recognized that "even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions [or] ask for

2. <u>**The Administrative Search of Mr. Cottman's Home Violated His Fourth Amendment
Rights.**</u>

"A probationer's home, like anyone else's, is protected by the Fourth Amendment's
requirement that searches be 'reasonable.'" <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 873 (1987) (citation
omitted). Although searches must generally be conducted pursuant to a warrant, the Supreme Court
has permitted exceptions "when special needs, beyond the normal need for law enforcement, make the
warrant and probable cause impracticable." <u>Id.</u> (citing <u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 351
(1985)).

A State's operation of a probation system meets the "special needs requirement," and
probationers have "conditional liberty properly dependent on observance of special [probation
restrictions]." <u>Griffin</u>, 482 U.S. at 873-74. Accordingly, "probation officers may search a
probationer's residence based on a reasonable suspicion that the probationer is engaged in criminal
activity therein." <u>United States v. Bowers</u>, No. CRIM.A 04-133 JJF, 2005 WL 1979142, at *3
(D.Del. Aug, 15, 2005) (citing <u>United States v. Knights</u>, 534 U.S. 112 (2001); <u>Griffin v. Wisconsin</u>,
483 U.S. at 868; <u>United States v. Baker</u>, 221 F.3d 438 (3d Cir. 2000); <u>United States v. Hill</u>, 967 F.2d
902 (3d Cir. 1992)).

In <u>Bowers</u>, this Court stated that the Supreme Court has noted that the "the concept of
reasonable suspicion is somewhat abstract." <u>Id.</u> at *3, citing <u>United States v. Arvizu</u>, 534 U.S. 266,
274 (2002). The Court explained, however:

Generally, for a suspicion to be reasonable, an officer must be able to articulate specific

---

identification." <u>United States v. Lockett</u>, 406 F.3d 207 (3d Cir. 2005) (citing <u>Florida v. Bostick</u>,
501 U.S. 429 (1991)). The right to unsupported inquiry, however, is limited by the consensual
nature of the encounter, and an individual is free to end such an encounter or to not respond.
<u>Bostick</u>, 501 U.S. at 434-35.

> facts that support the suspicion, and thus, justify the intrusion. 'Anything less would
> invite intrusion upon constitutionally guaranteed rights based on nothing more
> substantial than inarticulate hunches.' In evaluating whether a particular search was
> reasonable, 'it is imperative that the facts be judged against an objective standard:
> would the facts available to the officer at the moment of the seizure 'warrant a man of
> reasonable caution in the belief that the action taken was appropriate?'

Id. at *4 (citations omitted). See also Samson v. California (noting that the Court examines the

totality of the circumstances to determine whether a search is reasonable, and that "some states and

the Federal Government require a level of individualized suspicion" regarding the searches of parolee

homes ); see also United States v. Williams, 417 F.3d 3737 (3d Cir. 2005) (drawing no constitutional

distinction between probation and parole); Fuller v. State of Delaware, 844 A.2d 290 (Del. Supr.

2004) (requiring reasonable grounds, under Delaware law, for probation searches).[4]

Applying this standard to the circumstances in this case, the officers lacked reasonable

suspicion to conduct the administrative search of Mr. Cottman's home. As previously argued, the

officers impermissibly conducted the traffic stop of Mr. Torres' vehicle, which resulted in Mr.

Cottman's seizure, and had no specific, articulable facts indicating that Mr. Cottman was involved in

any illegal criminal activity.

Officer DuPont testified that he decided to contact his supervisor for search approval because

of the money that he found in Mr. Cottman's possession, his association with Mr. Torres, his location

in a high-drug trafficking area and the fact that he lied about his identity. (Tr. 110-112). This

information alone, however, does not support the administrative search of Mr. Cottman's home for

---

[4] Mr. Cottman notes the application of Delaware's reasonable suspicion standard to the
probation searches applies to the administrative search. For example, in Samson, the Supreme
Court rejected the defendant's reliance on the practices of jurisdictions other than California to
argue that California's system was constitutionally defective. Id. at 2201. The Court stated that
the practices of other jurisdictions was of "little relevance to our determination whether
California's supervisory system is drawn to meet its needs and is reasonable . . . ." Id.

suspicion of criminal behavior.

First, no drugs, drug paraphernalia or guns were found in Mr. Torres' vehicle or in Mr. Cottman's possession during the traffic stop and vehicle search. Mr. Cottman's association with Mr. Torres, who was independently suspected of drug activity, does not provide reasonable suspicion that Mr. Cottman was engaged in criminal activity. See e.g. Ybarra v. Illinois, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Indeed, Mr. Torres was not cited for the traffic violations and was free to leave after the traffic stop.

Second, Mr. Cottman's location in a high-crime area is insignificant, and suggests that police officers have the right to stop and question individuals merely on the basis of their location. The Third Circuit has previously rejected location in a high-crime area, without more, to support reasonable suspicion of criminal activity. See e.g., United States v. Roberson, 90 F.3d 75 (3d Cir. 1996) (rejecting the theory that, in the context of an officer's reliance on an uncorroborated, anonymous tip, a defendant is subject to a Terry stop because he was in an area known for narcotics sales). As noted by the officers during testimony, Mr. Cottman lived a few blocks from the area in which Mr. Torres' vehicle was stopped.

Third, Officer DuPont's reliance on Mr. Cottman's possession of money does not give rise to reasonable suspicion. It is equally likely that Mr. Cottman, who informed the officer that he was a painter and was paid under the table, had routinely kept cash in his possession. Here, there was no other evidence found in the searched vehicle or on Mr. Cottman's possession to suggest that he was engaged in criminal activity.

Fourth, evidence of Mr. Cottman's prior arrest history is not sufficient to support reasonable

suspicion to search his home. Prior criminal history, standing alone, does not provide reasonable suspicion. See e.g., Padilla v. Miller, 143 F. Supp. 2d 453, 470 (M.D. Pa. 1999) (rejecting a claim of reasonable suspicion based on prior criminal record and interstate travel). Although Mr. Cottman has a limited history of drug-related arrests, he has two drug-related convictions that are at least six years old.

Finally, although the officers also relied on the fact that Mr. Cottman used a "false name," as indicated by the DELJIS inquiry, the initial name provided by Mr. Cottman is one of his known aliases. At best, the officers discovered that Mr. Cottman was wanted for a civil court obligation and parole violation, but none of these factors suggests that he was engaged in criminal activity sufficient to warrant an administrative search of his home. Thus, where the officers lacked reasonable suspicion to conduct the administrative search of Mr. Cottman's home, any evidence subsequently obtained from the search must be suppressed as "fruit of the poisonous tree." Wong-Sun v. United States, 371 U.S. 407, 484-485.

### 3. Mr. Cottman's Statements Must Be Suppressed.

Mr. Cottman also submits that any alleged statements made during, or subsequent to, his unlawful arrest should be suppressed pursuant to the Fifth Amendment and Miranda v. Washington, 384 U.S. 436, 444 (1966) (stating that a suspect subjected to custodial interrogation must be advised of his rights prior to making a statement). Here, the officers admitted that, although they took Mr. Cottman into custody and conducted an administrative search of his home, they did not administer Mr. Cottman's Miranda warnings until he was taken to the police station. Under these circumstances, Mr. Cottman could not have made a voluntary, knowing and intelligent waiver of his Miranda rights. See

18

Rhode Island v. Innis, 446 U.S. at 300-01 (1980) (". . . Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."); Indeed, when the officers later advised Mr. Cottman of his rights, he immediately invoked his rights to remain silent. Thus, Mr. Cottman's statements must be suppressed. United States v. Jacobs, 431 F.3d 99 (3d Cir. 2005) (stating that if Miranda warnings are not given before a person is in custody, evidence resulting from the questioning must be suppressed).

## IV.  <u>CONCLUSION</u>

For the reasons set forth, Mr. Cottman submits that any and all evidence that was obtained after his illegal seizure, and the impermissible administrative search of his home, in violation of his Fourth Amendment rights, must be suppressed and excluded at trial.  Mr. Cottman further submits that his statements, which were obtained in violation of his Fifth Amendment rights must be suppressed and excluded at trial.

Respectfully submitted,

 /s/ Edson A. Bostic
Edson A. Bostic, Esquire
Federal Public Defender

Tieffa N. Harper
Research & Writing Attorney

Attorneys for Robert Cottman

Federal Public Defender's Office
District of Delaware
704 King Street, Suite 110
Wilmington, Delaware  19801
(302) 573-6010

Dated: July 17, 2007