IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,           :
                                    :
            Plaintiff,              :
                                    :
        v.                          :    Criminal Action No. 07-25-JJF
                                    :
ROBERT COTTMAN,                     :
                                    :
            Defendant.              :
                                    :
_____

Colm F. Connolly, United States Attorney, and Robert J.
Prettyman, Esquire, Assistant United States Attorney, of the
OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.

Attorney for Plaintiff.

Edson A. Bostic, Esquire, Federal Public Defender, and Tieffa N.
Harper, Esquire, Research & Writing Attorney, of the FEDERAL
PUBLIC DEFENDER'S OFFICE, Wilmington, Delaware.

Attorney for Defendant.

_____

**MEMORANDUM OPINION**

July 25, 2007
Wilmington, Delaware

Farnan, District Judge.

Pending before the Court is an Amended Motion To Suppress
Physical Evidence And Statements (D.I. 14) filed by Defendant,
Robert Cottman.  For the reasons discussed, Mr. Cottman's Motion
will be denied.

I.    **BACKGROUND**

On February 27, 2007, Defendant, Robert Cottman, was
indicted on two counts of being a felon in possession of a loaded
firearm in violation of 18 U.S.C. §§ 922(g)(1) and 942(a)(2) and
one count of being a felon in possession of ammunition in
violation of 18 U.S.C. §§ 922(g)(1) and 942(a)(2).  On May 25,
2007, Mr. Cottman filed the instant Motion To Suppress in
connection with what he contends was an illegal seizure on
February 17, 2007, and an illegal administrative search of his
home on February 18, 2007.  The Court conducted an evidentiary
hearing on June 7, 2007, and the hearing was continued on July 9,
2007.

By his Motion, Mr. Cottman contends that law enforcement
officials lacked probable cause and/or reasonable suspicion to
conduct the February 17, 2007 traffic stop which led to his
arrest.  Mr. Cottman further contends that law enforcement
officials lacked reasonable suspicion to conduct the
administrative search of his home on February 18, 2007.

1

II.  **FINDINGS OF FACT**

1.   On the evening of February 17, 2007, Mr. Cottman was riding as a front seat passenger in a silver 1999 BMW station wagon driven by Josue Torres in the vicinity of Third or Fourth and Clayton Streets, Wilmington, Delaware.  (D.I. 18 ("Tr.") at 32-36, 38, 53, 88-91).

2.   Officer Fox was working with State Probation Officer William Dupont that night and recognized the driver of the station wagon as Josue Torres.  (Tr. at 31, 33, 46-47, 50-53).

3.   Based on a computer check Officer Fox had run prior to this incident, Officer Fox believed Mr. Torres was driving on a suspended license.  (Tr. at 31, 33, 46-47, 50-53).

4.   Officer Dupont also had received information from at least three community sources that, within the last month, the station wagon he had observed had been operated by a person who was distributing drugs in that area.  Officer Dupont also knew from his experience that the area in which the car was seen was a high drug trafficking area.  (Tr. 91-92, 100-101, 110, 139, 157-158, 161; Govt. Exh. 6).

5.   Officer Fox conducted a DELJIS computer query of the vehicle's registration and received information regarding that query at 23:58:119.  (Tr. 13-15, 34-35, 46-48, 54-55, 87-90; Govt. Exhibit 1, 3, 10).  Officer Fox conducted a DELJIS computer query of the status of the driver's license of Josue Torres and

2

received information that his license was suspended at 23:58.477.
(Govt. Exh. 2)

6.    The computer checks concerning the vehicle and the
status of Mr. Torres licence occurred prior to any warrant checks
regarding Mr. Cottman, conducted by radio transmission or
computer inquiry.  (Tr. 13-17, 32-36, 46-48, 52-55, 80, 83-85,
88-91, 93-99; Govt. Exh. 3, 4, and 10).  In making this finding,
the Court notes that there is a discrepancy among the time stamps
on screens retrieved from the DELJIS system in connection with
computer inquiries that were run concerning Mr. Cottman's warrant
status, the time stamps of radio transmission results on the
warrant status checks of Mr. Cottman and the notes of Officer
Dupont.  However, different clocks were used for the times
associated with each of these sources.  Because the DELJIS clock
was the only clock that captured all of the relevant events, the
Court finds the time stamps associated with the DELJIS screens to
be the most accurate for purposes of establishing a time line
here.  The Court also finds the DELJIS time stamps to be more
accurate than the other clocks because, as Ms. Bell explained at
the hearing, the DELJIS time stamp is based on a computer-
generated satellite, and therefore, its time reporting is more
accurate than other time logs.  (Tr. 9, 12).

7.    After confirming that the driver was operating the
vehicle on a suspended license, Officer Fox and Officer Dupont

3

initiated a stop of the vehicle.  (Tr. 38).

8.    Although Officer Fox's report indicates that the traffic stop occurred at 11:30 p.m., Officer Fox explained at the hearing that his report was erroneous in this regard.  Due to a miscommunication between himself and Officer Dupont, Officer Fox explained that his initial contact with the vehicle was not called in, and therefore, when he went to complete his report hours later, he made his "best guess" at the time of the stop. The Court credits Officer Fox's testimony and finds that the time of the stop as indicated in the report was an unintentional error.  (Tr. 37-38).

9.    Following the stop of the vehicle, Officer Fox engaged Mr. Torres and Officer Dupont engaged Mr. Cottman.  Officer Dupont asked Mr. Cottman for identification.  Mr. Cottman said he did not have any identification and began to pat himself down as if he was attempting to locate his ID.  (Tr. 92-93).  Mr. Cottman then provided Officer Dupont with a false name and date of birth. (Tr. 93-94, 96-98; Govt. Exh. 4, 5, and 10).

10.   Officer Dupont then called that information into the Wilmington Police dispatch ("WILCOM").  As the call was in progress, Officer Dupont observed Defendant remove from his pants pocket a Delaware State ID and attempt to conceal it under his right leg.  Officer Dupont requested the ID, and then reached into the vehicle and removed the card from beneath Mr. Cottman's

4

leg.  (Tr. 98-99).  Officer Dupont then made a second radio call
to WILCOM to get a warrant check on Mr. Cottman's true identity.

11.  From the results of the radio warrant checks, Officer
Dupont learned that Mr. Cottman was wanted on two capiases from
Family Court and one capias from Superior Court.  (Tr. 17, 22,
94-96, 99).  Officer Dupont then arrested Mr. Cottman and
conducted a search of his person which yielded a large wad of
money.  (Tr. 99-100, 112, 148).  Officer Dupont asked Mr. Cottman
about the money, and Mr. Cottman stated that he received the
money "under the table" from a painting job.  (Tr. 100).  Mr.
Cottman was not given his <u>Miranda</u> warnings at this time.

12.  Officer Dupont also conducted a computer check and
learned that Mr. Cottman was on probation.  Officer Dupont also
learned that the capiases from Family Court were issued in
connection with support arrears and the capias from the Superior
Court was issued in connection with a violation of probation.
Officer Dupont also learned that Mr. Cottman had prior arrests
for seven drug-related charges spanning a period of ten years.
(Tr. 17-18, 101-103; Govt. Exh. 7).

13.  At 12:06, Officer Dupont called the State of Delaware
Probation Monitoring Center in Dover to confirm that Mr. Cottman
was on probation and to obtain his address.  Officer Dupont
learned that Mr. Cottman was an active probationer.  (Tr. 117-
118, 150).

14. The standard conditions for every probationer in Delaware allow for a search of the probationer's living quarters, with or without a warrant. (Court Exh. 18) (under seal).

15. Officer Dupont contacted his supervisor, Patrick Cronin, and obtained permission to search Mr. Cottman's home. (Tr. 114).

16. Officer Dupont asked Mr. Cottman if anyone was at home and where he resided in the residence. Mr. Cottman answered that his mother should be home and he lived in a room upstairs. (Tr. 117).

17. No one answered the door when Officer Dupont knocked, so he let himself in using a key retrieved from Mr. Cottman's person. Mr. Cottman's mother was standing on the landing of the stairs, and both she and Mr. Cottman sat on the couch while the home was searched. (Tr. 118).

18. The search was conducted at approximately 12:20 a.m. on February 18, 2007, and revealed firearms and ammunition, as well as Family Court paperwork and a greeting card. (Tr. 71, 117-126, 172-176).

19. When the results of the search were made known to Mr. Cottman's mother, Mr. Cottman, without prompting, stated that he found the ammunition outside and brought it inside to keep it away from his house. He also stated that he put the gun under his mother's mattress for her safety. (Tr. 38-40, 78, 120-125,

128-129).

20.   Probation Officer Cerminaro also found a bag with a semi-automatic revolver on the first floor of the home.  When the bag was found, Mr. Cottman looked in the direction of his mother and stated, "Mom, they found the bag."  (Tr. 38, 40-41, 78-79, 125-126).

21.   During transport to the Wilmington Police Department, Officer Fox and Officer Dupont mentioned that this case might be the first case in the new gun initiative by law enforcement agencies.  Mr. Cottman again stated that he found the guns on the side of his house and that he put the revolver under his mother's mattress for her safety.  (Tr. 41-42, 126-129).

22.   Once at the police station, Mr. Cottman was given his Miranda warnings.  He invoked his right to remain silent.

23.   Two days later, Mr. Cottman was transported to the U.S. Marshal's Office by Special Agent Diane Iardella of the Bureau of Alcohol, Tobacco, Firearms & Explosives and Agent Fiyock. Without any questions or prompting from the agents, Mr. Cottman stated, "This is all over that little gun I put under my mom's bed.  I'm not out there carrying guns and shooting nobody.  I've been shot.  I'm not messing around like that anymore."  Mr. Cottman also stated that he "took" a felony ten years ago.  (Tr. 185-187).

24.  The parties stipulated to the testimony of Mr. Torres
(D.I. 26); however, the Court does not credit his testimony.  Mr.
Torres testified that his license was not suspended, but that
testimony was contradicted by the computer information obtained
by Officer Fox.  Mr. Torres also testified that he refused to
consent to a search of his car because it belonged to his father.
Mr. Torres' testimony is contradicted by the computer information
indicating that the car was registered to Gloria-Torres.  Mr.
Torres' testimony is also contradicted by the testimony of
Officer Fox, whom the Court credits.

## III. CONCLUSIONS OF LAW

A.    The Seizure of Mr. Cottman In Connection With The
      Traffic Stop Of The Vehicle's Driver, Mr. Torres

25.  The Fourth Amendment to the United States Constitution
protects "the right of the people to be secure against
unreasonable searches and seizures. . . ."  U.S. Const, amend IV.

26.  A defendant who files a motion to suppress ordinarily
carries the burden of proof.  Rakas v. Illinois, 439 U.S. 128,
130 n. 1 (1978).  However, where a search is conducted without a
warrant, as is the case here, the burden shifts to the Government
to demonstrate by a preponderance of the evidence that the search
was conducted pursuant to one of the exceptions to the warrant
requirement.  See United States v. Herrold, 962 F.2d 1131, 1137
(3d Cir. 1992).  Evidence obtained pursuant to a warrantless
search that does not meet an exception to the warrant requirement

8

must be suppressed as "fruit of the poisonous tree." United
States v. Brown, 448 F.3d 239, 244 (2006) (citing Wong Sun v.
United States, 371 U.S. 471, 487-88 (1963)).

27.  Police are vested with the constitutional authority to
conduct a limited, warrantless, investigatory stop in a public
place if an officer has a reasonable suspicion of criminal
activity.  Terry v. Ohio, 392 U.S. 1, 88 (1968).  During a
traffic stop, the temporary detention of individuals, including
the passengers of the automobile, constitutes a "seizure" within
the meaning of the Fourth Amendment.  Whren v. United States, 517
U.S. 806, 809 (1996); United States v. Mosley, 454 F.3d 249 (3d
Cir. 2006) ("[A] traffic stop is a seizure of everyone in the
stopped vehicle.").

28.  Reasonable suspicion requires that "the detaining
officers must have a particularized and objective basis for
suspecting the particular person stopped of criminal activity."
United States v. Cortez, 449 U.S. 411, 417-18 (1981).  While
Fourth Amendment jurisprudence demands particularized suspicion,
courts also recognize that officers must be allowed "to draw on
their experience and specialized training to make inferences from
and deductions about the cumulative information available to them
that might well elude an untrained person." United States v.
Arvizu, 534 U.S. 266, 273 (2002).  Reasonable suspicion is to be
viewed from the vantage point of a "reasonable, trained officer

standing in [the detaining officer's] shoes." Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003). Whether the police have reasonable suspicion is determined from the totality of the circumstances. Cortez, 449 U.S. at 417. In evaluating whether a particular search was reasonable, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Terry, 392 U.S. 21-22.

29. Based on the totality of the circumstances in this case, the Court concludes that Officers Fox and Dupont had reasonable suspicion to stop the vehicle driven by Mr. Torres, in which Mr. Cottman was riding as a passenger. Officer Fox had prior knowledge that Mr. Torres' license was suspended, and he confirmed the accuracy of his prior knowledge through a computer check before initiating the traffic stop. The computer check revealed that Mr. Torres was operating the vehicle with a suspended license, which is a traffic violation under 21 Del. C. § 2756. "It is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations." United States v. Moorefield, 111 F.3d 10, 12 (3d Cir. 1997).

30. Having lawfully stopped the vehicle, Officer Dupont was entitled to ask Mr. Cottman for identification. United States v.

Lockett, 406 F.3d 207 (3d Cir. 2005); see also United States v.
Rice, 483 F.3d 1079, 1084 (10th Cir. 2007) (collecting cases)
(holding that police are entitled to ask passengers of a vehicle
for identification and run background checks on them, because
passengers present the same safety risks to officers as drivers
of vehicles).

31.  Mr. Cottman told Officer Dupont he did not have
identification, provided him with the name "Briant Cottman" and a
date of birth, and then attempted to conceal his actual
identification card in plain view of Officer Dupont.  Given Mr.
Cottman's deceptive behavior regarding his identity, the Court
concludes that Officer Dupont had probable cause to believe that
Mr. Cottman may be committing the felony of criminal
impersonation under 11 Del. C. § 907(1).  In these circumstances,
the Court further concludes that Officer Dupont had probable
cause to believe the ID might be evidence of criminal activity,
and therefore, Officer Dupont had legal justification to seize
the identification card from underneath Mr. Cottman's leg.  See
Texas v. Brown, 460 U.S. 730, 739, 741-744 & n.6 (1983).  Cf.
United States v. Murphy, 261 F.3d 741, 743-744 (8th Cir. 2001)
(holding that identification card could lawfully be seized where
defendant advised officer that he did not have identification on
him, but the officer saw the identification card protruding from
defendant's wallet in plain view).

11

32.  In sum, the Court concludes that the stop of Mr.
Torres, and the subsequent seizure of Mr. Cottman and his
identification card were lawful, and therefore, the Court will
deny Mr. Cottman's Motion To Suppress as it relates to the
initial stop and any evidence derived therefrom.

B.  <u>The Administrative Search Of Mr. Cottman's Home</u>

33.  "A probationer's home, like anyone else's, is protected
by the Fourth Amendment's requirement that searches be
'reasonable.'" <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 872 (1987).

34.  However, "[a] State's operation of a probation system
... presents 'special needs' beyond normal law enforcement that
may justify departures from the usual warrant and probable-cause
requirements." <u>Id.</u> at 873-74.  Accordingly, probation officers
may search a probationer's residence based on a reasonable
suspicion that the probationer is engaged in criminal activity
therein. <u>United States v. Knights</u>, 534 U.S. 112 (2001); <u>United
States v. Baker</u>, 221 F.3d 438 (3d Cir. 2000).

35.  Based on the totality of circumstances in this case,
the Court concludes that the search of Mr. Cottman's home was
reasonable.  Mr. Cottman was stopped in what Officer Dupont knew
to be a high drug distribution area.  Mr. Cottman was a passenger
in a car that had been identified by others as having been
involved in drug distribution, and Officer Dupont was aware of
these reports.  Mr. Cottman lived less than one mile from the

scene of the traffic stop. (Tr. 87, 108, 113-114). Mr. Cottman
was evasive concerning his identity and repeatedly lied to
Officer Dupont telling him he had no identification on him and
giving him a false name and date of birth. See e.g., United
States v. Brown, 448 F.3d 239, 351 (3d Cir. 2006) (identifying
factors that suggest suspicious behavior and may be sufficient to
establish reasonable suspicion as: defendant's presence in a high
drug trafficking area; defendant's presence on the street at a
late hour; defendant's nervous or evasive behavior; and
defendant's behavior conforms to police officers' specialized
knowledge regarding criminal activity); United States v. Hodge,
246 F.3d 301, 305-306 (3d Cir. 2001) (recognizing that
defendant's home might be likely repository for drug evidence
where, among other factors establishing probable cause, the home
was near the scene of the crime). Once Mr. Cottman's true
identity was revealed, warrant checks revealed three active
capiases. Mr. Cottman's criminal history check also showed prior
arrests, with several involving drug charges. See United States
v. Conley, 4 F.3d 1200, 1207 (3d Cir. 1993) (recognizing that
prior arrest or conviction, especially where crime is for same
general nature as the one for which the search is seeking to
discover evidence, is useful in establishing probable cause).
Mr. Cottman also possessed $500 in cash that he said he received
from being paid under the table. See e.g., Maryland v. Pringle,

540 U.S. 366, 371-372, n.2 (2003) (recognizing that cash in the amount of $763 found in the glove compartment of a car is a factor to consider in the totality of the circumstances to arrest the defendant for drugs seized in the vehicle); United States v. Chandler, 326 F.3d 210, 214-216 (3d Cir. 2003) (possession of over $8,200 not reported to the IRS was admissible proof that money may have be received from drug distribution). In addition, Mr. Cottman is a probationer and was advised of and agreed to warrantless searches of his living quarters at any time by a probation or parole officers. Thus, Mr. Cottman's reasonable expectation of privacy was lessened. Cf. United States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005) (recognizing that parolee who consented to warrantless search of property has less expectation of privacy than a reasonable person).

36. Because the Court concludes that the administrative search of Mr. Cottman's home was supported by reasonable suspicion in light of the totality of the circumstances, the Court concludes that any evidence obtained as a result of the search was lawfully seized. Accordingly, the Court will deny Mr. Cottman's Motion To Suppress evidence seized in connection with the administrative search of his home.

C.    Mr. Cottman's Statements

37. The Government may not use statements in its case-in-chief obtained as a result of custodial interrogation by law

14

enforcement officers, unless the defendant has been advised of,
and validly waived, his rights: (1) to remain silent, and that
any statements can be used as evidence against him; and (2) to
the presence of retained or appointed counsel during questioning.
Miranda v. Arizona, 384 U.S. 436, 444 (1966) (hereinafter
"Miranda warnings").

38.   In addition to Miranda warnings, the Government bears
the burden of proving that the defendant's statements were
voluntarily given.   Colorado v. Connelly, 479 U.S. 157, 167
(1986).

39.   The Supreme Court has recognized that, "coercive police
activity is a necessary predicate to the finding that a
confession is not 'voluntary.'"   Id.

40.   In addition to the "crucial element of police
coercion," courts also consider the following circumstances in
examining whether the totality of the circumstances point to a
voluntary confession:  the length of any interview by police, the
location of the interview, the defendant's age, physical
condition and mental condition, the defendant's prior experience
with the criminal justice system, and the failure to give Miranda
warnings.   United States v. Swint, 15 F.3d 286, 289 (3d Cir.
1994).

41.   The Government is not required to provide Miranda
warnings before questions regarding biographical data, necessary

15

to complete booking or pretrial services.  Pennsylvania v. Muniz, 496 U.S. 582, 600-02 (1990).

42.  Furthermore, Miranda warnings are not required before a volunteered or spontaneous statement that is not made in response to questioning, even if the suspect is in custody.  Miranda, 384 U.S. at 444.

43.  Although Mr. Cottman did not receive his Miranda warnings until he arrived at the police station, the Court concludes that the statements he made at his residence and in the patrol car regarding the seized evidence were voluntary.  Mr. Cottman's remarks were not made in response to any questioning or any threats by the officers.  (Tr. 38-42, 55, 59, 78-79, 122-129, 174-175, 184-187).  There was also a significant time gap between Mr. Cottman responses to Officer Fox's brief questions concerning where and with whom he lived and which room was his and the statements Mr. Cottman blurted out when the evidence was uncovered by the officers searching his home.[1]  (Tr. 13-16, 36,

---

[1]    The Court recognizes that its conclusion here is contrary to the conclusion it reached regarding voluntariness of statements in United States v. Brunswick, 2002 WL 31466451, *1-2 (D. Del. Nov. 4, 2002); however, the Court finds the circumstances in Brunswick to be distinguishable from the circumstances here.  Unlike Mr. Cottman who was asked a few brief questions concerning his residence, the defendant in Brunswick was subjected to a 25 to 30 minute interview without Miranda warnings before entering an elevator and making additional statements which the Court concluded were not voluntary.  In addition, the Court was not persuaded that the second statements made in the elevator were not made in response to direct questioning given that the officer's recollection regarding the

39-42, 48, 71, 84-85, 92-100, 115, 117-120, 124-128); See United States v. Pettigrew, 468 F.3d 626, 635-636 (10th Cir. 2006) (holding that admission was voluntary in light of totality of circumstances where, among other things, a time gap of 30 minutes existed between first unMirandized custodial interview, and subsequent voluntary statement); Medeiros v. Shimoda, 889 F.2d 819, 823-825 (9th Cir. 1989) (same). Mr. Cottman was 31 or 32 years, and has had prior experience with the criminal justice system. (Tr. 128; Govt. Exh. 7). Although the officers mentioned that this case was the first case under the new gun initiative while they were escorting Mr. Cottman to the police station, the Court concludes that the officers' remarks were not the type of remarks that could reasonably be expected to elicit an inculpatory response from Mr. Cottman. See United States v. Calisto, 838 F.2d 711, 718 (3d Cir. 1988).

44. During escort to the U.S. Marshal's Office and subsequent to receiving his Miranda warnings, Defendant also made additional statements, which the Court likewise concludes were voluntarily given. Neither agent escorting Mr. Cottman engaged him in any conversation during this transport. (Tr. 185-187). In addition, Mr. Cottman had already received his Miranda warnings and was aware of his right to remain silent.

---

conversation was unclear.

45.   In these circumstances, the Court concludes that the statements made by Mr. Cottman during the search of his residence, in the patrol car during transport to the police station, and during transport to the U.S. Marshal's Office were voluntary, and therefore, the Court will deny Mr. Cottman's request to have these statements suppressed.

## IV.   CONCLUSION

For the reasons discussed, the Court will deny Mr. Cottman's Amended Motion To Suppress Physical Evidence And Statements.

An appropriate Order will be entered.

18